# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### Civil No. 09-2029

GABRIEL ROBERT GONZALEZ
Petitioner

v.

RANDALL BRITTON, et. al
Respondents

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITION FOR A WRIT OF HABEAS CORPUS

PAUL M. GEORGE, ESQUIRE
Identification No. 25722
*McKinney & George*
239 South Camac Street
Philadelphia, PA 19107
(215) 735-0598
pgeorge@mckinneyandgeorge.com

Attorney for Petitioner

# TABLE OF CONTENTS

I. Overview                                                                        5

II. Procedural History                                                             6

III. Factual History                                                               9

  A. Factual History - Facts presented at the suppression hearing and trial      9
  B. Factual History – After-discovered evidence during 1st PCRA proceeding      14
  C. Factual History – New evidence presented in 2d PCRA proceeding             20

IV.     Exhaustion of State Remedies                                          21

  A. Mr. Gonzalez' June 28, 2010 PCRA petition                                  21
  B. Mr. Gonzalez' October 17, 2013 PCRA petition                               22

V. Federal Jurisdiction                                                            23

VI. The After-Discovered Evidence                                                  27

  A. The significance of the new evidence                                       27
  B. The evidence would have affected the outcome of Petitioner's trial        29

VII. Petitioner's Claims are not Procedurally Defaulted                            35

Conclusion                                                                         39

**EXHIBITS SUBMITTED WITH MEMORANDUM OF LAW**

**Exhibit "A"** - Reproduced Record, <u>Commonwealth v. Gonzalez</u>, 826 EDA 2012 (Superior Court, Pa.)

**Exhibit "B"** - Opinion, Byrd, J., <u>Commonwealth v. Gonzalez</u>, CP-51-CR-0303521-2000 (4/23/12)

**Exhibit "C"** – Memorandum Opinion, <u>Commonwealth v. Gonzalez</u>, 826 EDA 2012 (12/18/12)

**Exhibit "D"** – Third Petition for Post-Conviction Relief (10/17/13) (Time Stamped Cover Page)

**Exhibit "E"** – Affidavit, Clifford Terlonge

**Exhibit "F"** – Affidavit, Tyree Bush

**Exhibit "G"** – Affidavit, Gabriel Gonzalez

**Exhibit "H"**- Interview, Police Officer McGarrey

**Exhibit "I"** - Activity Sheet, Detective Gross

**Exhibit "J"** – Property Receipt 2256127

**Exhibit "K"** – Property Receipt 2246127

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GABRIEL ROBERT GONZALEZ,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | **No. 09-2029** |
| **RANDALL BRITTON, et al.,** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS**

On May 1, 2009, Gabriel Gonzalez petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On May 6, 2010, Mr. Gonzalez for the first time raised certain claims before this Court based on new evidence, which only became available to him after he filed his habeas corpus petition. Because these claims had never been presented to a state court, this Court determined that Mr. Gonzalez' habeas petition should be held in abeyance, pending the state court's resolution of his after-discovered evidence issues.

Pursuant to this Court's instructions, Mr. Gonzalez filed a new state court PCRA petition and exhausted his after-discovered evidence claims in Pennsylvania's courts. Thereafter, as he was preparing to submit a memorandum of law in support of those claims in this Court, he once again became aware of new after-discovered evidence. As a consequence, on October 17, 2013, Mr. Gonzalez filed another PCRA petition in the Philadelphia Court of Common Pleas.

Mr. Gonzalez filed this new PCRA petition in state court, in order to comply with Pennsylvania's 60 rule. He also filed this new petition because he was concerned that this Court would not or could not address the claims set forth therein, inasmuch as those specific claims have not previously been the subject of a state court ruling.

However, as will be argued below, Petitioner asks this Court to consider also the new evidence contained in his most recent PCRA petition. As will be seen, the new evidence presented in Mr. Gonzalez' most recent PCRA petition is closely related to and intertwined with the after-discovered evidence initially presented to this Court on May 6, 2010. Accordingly, Mr. Gonzalez asks this Court to consider whether the evidence newly discovered in 2013 would more appropriately be deemed *supplemental* to his already exhausted after-discovered evidence claims, and therefore cognizable by this Court even in the absence of state court review.

I.    <u>Overview</u>

This case is factually complex. Petitioner Gabriel Gonzalez requests, in advance, the patience of the Court in reviewing the after-discovered evidence and in evaluating how this evidence comports with the facts of this case and his longstanding claim of actual innocence.

As noted above, Mr. Gonzalez has filed *two* new state court petitions for post-conviction relief since he was last before this Court.[1] In a June 28, 2010 petition, Mr. Gonzalez presented evidence indicating that one or more police witnesses gave false testimony at both his trial and at his pre-trial suppression hearing. In that 2010 petition, he also presented after-discovered evidence of his actual innocence, in the form of two new witnesses. He further argued that, but for the actions of the investigating officers, one of these new witnesses would have been available to the defense at the time of Petitioner's trial.

---

[1]    The two PCRA petitions referenced here—both of which have been filed by Petitioner since this Court placed his 2254 petition in abeyance—actually constitute his second and third PCRA petitions. Prior to the initiation of the instant federal proceedings, the state court denied Mr. Gonzalez' first PCRA petition.

The PCRA court denied Mr. Gonzalez' 2010 petition as untimely and the state appellate courts have affirmed that decision.

On October 17, 2013, Mr. Gonzalez filed a second new PCRA petition. This petition is based on after-discovered evidence acquired by Mr. Gonzalez on August 28, 2013. As will be seen, this new evidence points directly to the guilt of an alternative suspect and bolsters Petitioner's prior claims regarding false testimony offered by police witnesses at his trial. Petitioner alerts this Court to the existence of this new state court petition, so that this Court can determine the appropriate course of action with respect to the instant habeas corpus petition.

With this overview in mind, the procedural and factual history of this case, as well as the after-discovered evidence presented in Mr. Gonzalez' two PCRA petitions, may be summarized as follows:

## II.    Procedural History

On February 21, 2001, after a trial conducted by the Honorable David N. Savitt, a jury convicted Petitioner of second degree murder. On that date, Judge Savitt sentenced Mr. Gonzalez to life imprisonment. Commonwealth v. Gonzalez, CP-51-CR-0303521-2000.

On August 7, 2002, the Superior Court affirmed Petitioner's conviction and sentence. Commonwealth v. Gonzalez, 2019 EDA 2001. On September 3, 2004, the Pennsylvania Supreme Court denied Mr. Gonzalez' petition for appellate review. Commonwealth v. Gonzalez, 439 EAL 2002.

On May 18, 2007, the Honorable Sandy L.V. Byrd denied Mr. Gonzalez' first petition for post-conviction relief. On August 18, 2008, the Pennsylvania Superior Court

affirmed the dismissal of Mr. Gonzalez' first PCRA petition.  Commonwealth v. Gonzalez, 1586 EDA 2007.  On January 16, 2009, the Pennsylvania Supreme Court denied Mr. Gonzalez' petition for appellate review.  Commonwealth v. Gonzalez, 498 EAL 2008.

On May 1, 2009, Petitioner filed a timely *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Pennsylvania.  Gonzalez v. Britton, 09-2029 (E.D. Pa.).

On May 6, 2010, Petitioner added an after-discovered evidence claim to his *pro se* federal habeas petition.  (Report and Recommendation, Strawbridge, J., 5/28/10 ("Report"), at 7; Reproduced Record ("R.R."), Exhibit "A", at 67a.).[2]  In response, the Commonwealth argued that Petitioner's after-discovered evidence claim should be addressed by the courts of Pennsylvania, prior to federal review.  (Report; R.R., Exhibit "A", at 74a).

On May 28, 2010, the Honorable David R. Strawbridge prepared a Report and Recommendation directing that Mr. Gonzalez' habeas petition be held in abeyance. Judge Strawbridge further directed Petitioner to file a petition for post-conviction relief in the Philadelphia Court of Common Pleas.  (Report; R.R., Exhibit "A", at 77a-78a).

On June 28, 2010, the Philadelphia Court of Common Pleas received and docketed Mr. Gonzalez' *pro se* Petition for Post-Conviction Relief based on Newly Discovered Evidence.  (Cover Page, *Pro Se* PCRA Petition; R.R., Exhibit "A", at 79a).

---

[2]     "R.R." refers to the Reproduced Record submitted by Mr. Gonzalez in conjunction with his state court appeal of the denial of his June 28, 2010 PCRA petition. This Reproduced Record contains most of the documents which will be referenced here. A copy of this Reproduced Record is attached here as Exhibit "A".

On April 29, 2011, Petitioner filed a counseled Amended Petition for Post-Conviction Relief. (Amended Petition; R.R., Exhibit "A", at 23a).

On September 15, 2011, in response to the Commonwealth's motion to dismiss, Petitioner filed a Response to the Commonwealth's Motion to Dismiss. (Response; R.R., Exhibit "A", at 90a).

On October 31, 2011, Petitioner filed a counseled Second Amendment to his Petition for Post-Conviction Relief. (Second Amendment; R.R., Exhibit "A", at 104a).

On January 20, 2012, the Honorable Sandy L.V. Byrd issued a Notice of Intention to Dismiss under Rule 907.

On February 23, 2012, Petitioner filed a Petition to Reconsider and to Augment Record with Additional Evidence. (Petition to Reconsider; R.R., Exhibit "A", at 113a).

On 2/24/12, the PCRA court denied Petitioner's petition for post-conviction relief as untimely. The PCRA court did not conduct an evidentiary hearing. (Opinion, Byrd, J.; Exhibit "B".)

On December 18, 2012, the Superior Court affirmed the PCRA court's decision. (Memorandum Opinion; Exhibit "C".)

On June 7, 2013, the Pennsylvania Supreme Court denied Mr. Gonzalez' Petition for Appellate Review. Commonwealth v. Gonzalez, 25 EAL 2013.

On August 28, 2013, prior to the due date for this federal filing, Petitioner became aware of the new evidence set forth below. On October 17, 2013, in an effort to comply with the bewildering rules applicable to the interplay between state and federal post-conviction proceedings, Petitioner raised his new after-discovered evidence claim in a

new state court PCRA petition. As of this writing, that petition remains open in the Philadelphia Court of Common Pleas. (Third PCRA Petition, cover page; Exhibit "D").

## III. Factual History

The complex factual history of this matter will be set forth in three subsections. Subsection A outlines the facts presented during Mr. Gonzalez' original suppression hearing and trial. Subsection B reviews the after-discovered evidence presented during the course of his June 28, 2010 PCRA petition. Subsection C sets forth the facts pertaining to the newly discovered evidence in his October 17, 2013 PCRA petition.

### A. Factual History - Facts presented at the suppression hearing and trial

In order to evaluate the significance of Petitioner's new evidence, the testimony introduced at Mr. Gonzalez' suppression hearing and trial must be set forth in some detail.

#### 1. *Facts pertaining to the murder of Vincent Green*

Decedent Vincent Green was employed as a pizza deliveryman. On February 29, 2000, at around 11:40 p.m., Mr. Green ran from his parked car into his workplace and expired in the arms of store manager Bruce Sulpizio. (N.T. at 837).[3] The cause of his death was a single gunshot wound.

Store manager Sulpizio looked outside and saw a person with a gun in the vicinity of Mr. Green's car. Importantly, unlike Mr. Gonzalez, the person Mr. Sulpezio observed was a "chunky" black man of medium height, with an afro, wearing "something bright up top, either a hat or a turtleneck." (N.T. at 837, 847, 851). When questioned by the police, Mr. Sulpizio stated that he had never seen the black man with the gun before.

---

[3] "N.T." refers to the notes of testimony from Petitioner's 2001 trial and pre-trial motion to suppress.

(N.T. at 847). Mr. Sulpizio knew Mr. Gonzalez from the neighborhood and did not identify Petitioner as the shooter. (N.T. at 848).

Officer Francisco Hernandez arrived at the scene almost immediately. While in the area, he also observed a man fitting the flash description given by Mr. Sulpizio. As he watched, Officer Hernandez observed the man going into "one of the houses" on the 5900 block of Lawrence Street. (N.T. at 863). Importantly, Officer Hernandez described the man as "a dark male with an afro wearing what appeared to be like a red sweater or hoodie type around his neck." (N.T. at 876). Officer Hernandez testified that he could not recognize the man whom he observed. (N.T. at 876).

At the crime scene, the police inspected the car that Vincent Green had been using to make his deliveries. On the back seat of that car, crime scene technician Trenwith discovered pieces of a broken interior dome light. He also claimed to have observed a .45 caliber fired cartridge casing lying on a child-protection seat situated on the rear driver's side of the car. (N.T. at 798-799, 827).

While still on the scene, in the early hours of March 1, 2000, Officer Trenwith took photographs of the broken pieces of the interior light. (N.T. at 798-799). However, although he claimed to have observed an important piece of ballistic evidence on the child-seat, he neither photographed the FCC nor secured it for future examination. Instead, he decided to leave the FCC where it was and to allow the car to be towed overnight to the police garage. According to Trenwith, he simply assumed that everything would still be just where it was the following night, when he intended to go to the police garage to re-examine the car. (N.T. at 822-823, 827).

2. *Facts relating to the arrest of Mr. Gonzalez for retail theft*

At around noon on March 1, 2000 (approximately twelve hours after the murder), the police arrested Mr. Gonzalez for the retail theft of a pair of sneakers. (N.T. at 531, 533, 893). The arresting officer transported him to the 35th Police District headquarters.

At or about 4:00 p.m. on March 1 (approximately 16 hours after the murder and four hours after the retail theft) Mr. Gonzalez spoke to Detective Mock in the police station and informed the detective that he did not wish to give a statement regarding the sneakers. (N.T. at 522, 531).

3. *Facts relating to the allegedly anonymous call*

As a result of the retail theft, the police continued to hold Petitioner after 4:00 p.m. on March 1, 2000, when he refused to speak to Detective Mock. Mr. Gonzalez was still in custody some eight hours later, at 12:01 a.m. on March 2, 2000. At that hour, Officer Gregory Holman arrived on duty at the same police station. (N.T. at 926).

At around 2:00 or 3:00 a.m. on March 2, 2000 (approximately 26 or 27 hours after the murder), an allegedly anonymous caller telephoned the police station, claiming to have information regarding the murder of a pizza deliveryman. (N.T. at 925-926, 927). The officer who received the call asked the other officers at the station whether anyone was aware of such a case. Officer Holman then volunteered to speak to the anonymous caller. Although he was allegedly "off the night it happened," Officer Holman claimed to have heard about the incident on television. (N.T. at 926-927, 929).

Officer Holman then received certain information from the caller. Based upon what he heard, Holman told the anonymous caller to call back on a different telephone number, in order to speak to a detective. (N.T. at 928). Holman then went to the

detective's offices in the station to receive the anticipated return call. When the unknown man called back, Holman passed the phone to Detective Edward Davis. (N.T. at 929).

According to Detective Davis, at around 4:00 a.m. on March 2, 2000 (approximately 28 hours after the murder), Officer Holman informed Davis that Holman had just received an anonymous phone call and that the caller had information about the killing. (N.T. at 541-542). According to the caller, at approximately 11:00 or 12:00 o'clock "last night", Mr. Gonzalez had allegedly admitted committing the February 29 murder to the anonymous caller. (N.T. at 543, 546-547). Importantly, Mr. Gonzalez had in fact been in continuous police custody since 12:00 p.m. (noon) of the *day* before the anonymous call and could not have confessed to anyone on the previous night. Detective Davis testified that he tried, allegedly without success, to identify the caller by using the *69 call-back feature. (N.T. at 544, 931, 985).

4. *Facts relating to the interrogation of Gabriel Gonzalez*

After receiving this supposedly anonymous call, the police transported Petitioner to the Police Administration Building. There, at age 18, he was interrogated by homicide detectives. Gabriel Gonzalez has always maintained that the statement he eventually gave that morning was false and that it was the product of coercion and intimidation.

The homicide interrogation commenced at 4:45 a.m. on March 2, 2000. Some six hours later, at 10:30 a.m., Petitioner signed an eight-page document, typed by a detective, confessing to the murder. (N.T. at 1006-1019). In his statement, Mr. Gonzalez described the clothing he had supposedly worn during the robbery as Timberland boots, dark pants, dark shirt, and a black knit hat with a ball on top. (N.T. at 1014).

Shortly thereafter, at or about 11:20 a.m. on March 2, the police permitted defense attorney Steven Serota to speak with Mr. Gonzalez in the homicide detective's interview room. (N.T. at 574, 675-676). Petitioner immediately informed the lawyer that the statement he had just given to the police was false. (N.T. at 662). He also informed the attorney that he had been choked by an interrogating officer. (N.T. at 662). Mr. Serota noticed a pronounced "very red" mark running along the length of Petitioner's neck, "from hairline to hairline." (N.T. at 662).

5. *Evidence introduced at Mr. Gonzalez' trial*

Mr. Gonzalez litigated a pre-trial suppression motion, during which he testified that his statement had been coerced. The trial court denied Petitioner's motion.

At trial, none of the witnesses identified Petitioner as the person whom they had seen fleeing from the crime scene. However, the Commonwealth introduced evidence that Mr. Gonzalez lived in "one of the houses" on the 5900 block of Lawrence Street— the same block where Officer Hernandez had observed the fleeing robber.

The Commonwealth also introduced physical evidence recovered during a search of Petitioner's parents' house, conducted at 1:00 p.m. on March 2, 2000. During the search, the police recovered certain generic items of dark clothing, which generally matched the clothing description provided in Petitioner's statement. (N.T. at 1025). They did not recover any article of clothing matching the "red hoodie" or something "bright up top" described by crime scene witnesses Bruce Sulpizio and Officer Hernandez. (N.T. at 1039). No forensic evidence linked any of the recovered clothing to the murder of Vincent Green.

The police also recovered a plastic gun-dealer's container, designed to hold a .45 caliber handgun. (N.T. at 1027). They did not recover any guns or ammunition. The Commonwealth also introduced Mr. Gonzalez' post-arrest statement.

**B. Factual History – After-discovered evidence at the 1st PCRA proceeding**

The new evidence initially presented to this Court on May 6, 2010 and subsequently presented in Mr. Gonzalez' June 28, 2010 PCRA petition is as follows:

1. *Evidence Indicating that Officer Holman was present at the crime scene*

Officer Gregory Holman (Badge 6270) was the officer who spoke on the phone to the allegedly anonymous accuser. He testified that he only accepted the call, because he had heard about the murder of the deliveryman on TV during his day off. (N.T. at 926-927, 929). This testimony was false. As a police crime scene log demonstrates, Officer Holman was actually one of the officers who responded to the crime scene after the February 29 robbery.

The officer's first denial occurred on March 2, 2000 (only 29 hours after the murder). At that time, Homicide Detective Patterson interviewed Officer Gregory Holman (Badge 6270). During that interview, the officer specifically denied being at the crime scene on February 29:

Q. Did you respond to the shooting at 6015 N. 5th Street on 2-2-29?

A. No.

(Investigation Interview Record, Form 75-483, 3/2/00; R.R., Exhibit "A", at 80a).

The second denial occurred at Petitioner's trial. During his testimony, Officer Holman claimed that he had been "off" on February 29, when the robbery/murder

occurred.  (N.T. at 926-927, 929).  According to his trial testimony, he allegedly took the anonymous March 2 call, simply because he had heard about the crime on TV:

> I was actually off the night it happened, but I always watch the news so I had an idea of what she [the officer who initially took the call] may have been talking about.

(N.T. at 927).

However, contrary to these claims, Officer Holman was *not* off duty on the night of the robbery and *was* present at the crime scene.  As the Crime Scene Information report demonstrates, Officer Holman (Badge 6270) actually arrived on the scene only 45 minutes after the murder.  While present, he seemingly completed a property receipt of some kind.  (Crime Scene Log, Line 11; R.R., Exhibit "A", at 83a).

2.  *Evidence that the police knew the identity of the "anonymous" caller*

Petitioner's Reproduced Record contains three documents indicating that, contrary to the prior claims of police witnesses, the police were actually aware of the identity of the anonymous caller and failed to disclose that information to the defense. These documents also indicate that the caller lied when he told the police that Mr. Gonzalez had admitted committing the murder.

The first document is an affidavit signed by Alec Hector, the so-called anonymous caller.  In his affidavit, Mr. Hector has acknowledged that he called the police station while Mr. Gonzalez was in custody for retail theft and falsely claimed that Mr. Gonzalez had confessed to the murder.  (Affidavit, Alec Hector, at 1; R.R., Exhibit "A", at 84a).

Mr. Hector has also acknowledged that he was afraid of being implicated in the murder himself. He further admitted that he previously "had problems with" Mr. Gonzalez. (Affidavit, Alec Hector; R.R., Exhibit "A", at 84a).

Mr. Hector's affidavit also states that the police *were aware* of his identity. According to Mr. Hector, after his first conversation with Officer Holman, the police used the *69 return-call function to initiate a second call. At the time of the second call, he told the police his name, after they assured him that he was not a suspect in the case. (Affidavit, Alec Hector; R.R., Exhibit "A", at 84a). Mr. Hector's affidavit also admits that he was "in the area" before the murder "to buy pizza." (Affidavit, Alec Hector; R.R., Exhibit "A", at 84a).

The second document is an interview of Alec Hector, conducted by assigned Homicide Detective Gross, inside the District Attorney's office. This interview occurred on February 7, 2001, *while jury selection for Mr. Gonzalez' case was already in progress*. (Investigation Interview Record, 2/7/01 ("Hector Interview"), at p.3; R.R., Exhibit "A", at 86a).

At the time of the February 7, 2001 interview, Mr. Hector falsely told the police that he did not make the anonymous call. Nevertheless, the 75-483 remains significant, because it demonstrates that Detective Gross was either aware, or had strong reason to believe, that Hector truly was the caller. Yet, neither the police nor the Commonwealth provided any information regarding Hector to the defense.

The third document is an Affidavit from Department of Corrections Inmate Chester Wiles. Mr. Wiles is an inmate who was incarcerated with Alec Hector, when Hector was serving a sentence in the Pennsylvania State Prison System for an offense

unrelated to the charges in issue here. In this affidavit, Inmate Wiles describes a conversation he had with Hector. During this conversation, Hector admitted making a phone call to the police, during which he falsely accused Mr. Gonzalez. During this conversation, Hector also admitted to Wiles that Hector was the "anonymous caller." Hector also acknowledged that he did not, in reality, make the call anonymously and that the officer he spoke to was someone with whom he was familiar. (Affidavit, Chester Wiles; R.R., Exhibit "A", at 117a).[4]

3. *The eyewitness evidence of Officer Hernandez*

As noted above, on the night of the murder, Officer Francisco Hernandez observed a man fitting the flash description running into "one of the houses" on the 5900 block of Lawrence Street. (N.T. at 863). Although he could not make an identification, Officer Hernandez' testimony did not exclude Mr. Gonzalez as the person he had seen. During the years since Petitioner's trial, Officer Hernandez has sometimes encountered and spoken to Petitioner's father, Kevin Clark. Unsolicited by Mr. Clark, Officer Hernandez has often asked Mr. Clark about his son.

In the month prior to the filing of Mr. Gonzalez' Amended Second Petition, Officer Hernandez verbalized to Mr. Clark something that had seemingly troubled him for years: although he did not explicitly so testify at trial, the man whom the officer observed running from the crime scene was *not* Gabriel Gonzalez. Officer Hernandez' comments are memorialized in an affidavit submitted by Mr. Clark. (Affidavit, Kevin Clark; R.R., Exhibit "A", at 89a).

---

[4]     Mr. Gonzalez submitted inmate Wiles' affidavit in a February 23, 2012, Petition to Reconsider and to Augment Record with Additional Evidence. (R.R., Exhibit "A", at 113a).

#### 4. *Evidence that the plastic gun container did not belong to Mr. Gonzalez*

A noted above, when the police searched Petitioner's bedroom, they recovered a firearm dealer's plastic container for a .45 caliber handgun. (N.T. at 1027). Because a crime scene investigator had allegedly discovered a .45 caliber fired cartridge case in the decedent's car (which the investigator didn't bother to note or photograph until the next night, after Mr. Gonzalez' parents' home had already been searched), the Commonwealth argued for an inference of guilt based upon the presence of the container in Petitioner's bedroom.[5]

During the pendency of the PCRA proceedings, Petitioner became aware of after-discovered evidence from his younger brother, Kevin Clark, Jr., bearing directly on the presence of the gun container recovered by the police. At the time of Petitioner's arrest, Kevin Clark, Jr. was living with his parents and siblings at 5914 North Lawrence Street, Philadelphia PA. At the time of Petitioner's February 2000 arrest, he was twelve years old (DOB 8/24/88). Because of his youth, his parents did not discuss any of the details of the case against Gabriel Gonzalez with his younger brother.

---

[5]      As will be discussed further below, the crime scene investigator's alleged conduct with respect to the .45 caliber fired cartridge casing strains credulity. It seems unimaginable that, while still on the scene, the investigator would observe a piece of evidence as tiny and as important as a fired cartridge casing, and simply leave it where it was. It seems equally bizarre that an investigator would photograph the broken interior light of the decedent's car, but fail to photograph the at least equally significant fired cartridge casing that he simultaneously observed. The investigator then allowed the decedent's car to be towed, confident that an object as small and as mobile as a cartridge casing would still be in the same place the next morning. (N.T. at 798-799, 822-823, 827). Significantly, in between the time when the car was towed and the time when the investigator returned to the car, the police conducted a search of Petitioner's parents' home and recovered a gun case for a .45 caliber firearm. Only after this discovery did the investigator find the .45 caliber fired cartridge casing.

As the years went by, Kevin Jr. came to understand that his older brother had been convicted of murder. Still, even with the passage of time, he remained ignorant of the details of the Commonwealth's evidence against Mr. Gonzalez. In particular, he was unaware that the police had searched his brother's bedroom and recovered a gun box that had been introduced as evidence against Petitioner.

In mid-September, 2011, Kevin Clark, Jr. accompanied Petitioner's wife to a case conference at Petitioner's attorney's offices. At that meeting, Mr. Clark learned for the first time that the police had recovered a box designed to hold a .45 caliber handgun in Mr. Gonzalez' bedroom. When he learned for the first time about this aspect of the evidence, Mr. Clark recalled an incident that occurred after his brother had been arrested but before the police searched his brother's bedroom. Specifically, Mr. Clark recalled that a man, who identified himself as a "friend" of Gabriel Gonzalez, came to 5914 North Lawrence Street. This man gave Mr. Clark an unusual looking box—a hard plastic type container—and told Mr. Clark to give the box to Mr. Gonzalez.

Mr. Clark accepted the seemingly empty box and placed it in his brother's bedroom, intending to inform his brother about the box when he returned. However, due to his arrest, Mr. Gonzalez never came home. As a result, his twelve year old brother never told him about the box and never understood that the box had a possible connection to the charges against Mr. Gonzalez. After Mr. Clark informed counsel of his recollections, he completed an Affidavit memorializing what had occurred. (Affidavit, Kevin Clark, Jr. (10/28/11); R.R., Exhibit "A" at 111a).

### C. Factual History –new evidence presented in 2d PCRA proceeding

The newly discovered evidence presented in the October 17, 2013 PCRA petition consists of three affidavits, signed respectively by witnesses Clifford Terlonge, Tyree Bush, and Petitioner Gabriel Gonzalez. As these affidavits indicate, Mr. Terlonge and Mr. Bush are individuals who, at the time of the incident, resided in the Philadelphia neighborhood where the murder occurred.

The affidavit of Clifford Terlonge describes an encounter Mr. Terlonge had with both Alec Hector and Officer Gregory Holman on the night of the murder. (Affidavit, Clifford Terlonge; Exhibit "E"). The affidavit of Tyree Bush indicates that Mr. Bush witnessed Mr. Terlonge during Terlonge's interaction with Officer Holman on the night of the murder. (Affidavit, Tyree Bush; Exhibit "F"). The affidavit of Mr. Gonzalez describes how and when he first came into contact with the two affiants. (Affidavit, Gabriel Gonzalez; Exhibit "G").

When read in context of the previously submitted evidence described above, these affidavits demonstrate the following:

1. Contrary to his sworn trial testimony, Officer Gregory Holman (Badge 6270) was, in fact, at the crime scene after the shooting. Officer Holman was observed at the crime scene by affiants Terlonge and Bush. (Affidavit, Clifford Terlonge; Exhibit "D") (Affidavit, Tyree Bush; Exhibit "E").

2. Alec Hector—the man who made the "anonymous call" accusing Petitioner and whom the police secretly interviewed on the eve of Petitioner's trial—was near the crime scene before the shooting. Affiant Terlonge observed Hector in the area and had a conversation with him. (Affidavit, Clifford Terlonge; Exhibit "D").

3. Prior to the robbery/murder, Alec Hector spoke to affiant Clifford Terlonge and told Mr. Terlonge that he intended to commit a robbery. (<u>Affidavit</u>, Clifford Terlonge; Exhibit "D").

4. Prior to the robbery/murder, Alec Hector was wearing red hoodie and had an afro hairstyle—an appearance that matched the descriptions of the shooter provided by the eyewitnesses to the shooting. (<u>Affidavit</u>, Clifford Terlonge; Exhibit "D").

5. After the murder, affiant Clifford Terlonge provided information to Officer Holman, which would potentially have enabled the officer to locate and interview Alec Hector. (<u>Affidavit</u>, Clifford Terlonge; Exhibit "D").

6. Petitioner Gabriel Gonzalez did not become aware of this new evidence until August 28, 2013. (<u>Affidavit</u>, Gabriel Gonzalez; Exhibit "F").

## IV.  <u>Exhaustion of State Remedies</u>

### A.  Mr. Gonzalez' June 28, 2010 PCRA petition

Petitioner has exhausted the claims raised in his June 28, 2010 PCRA petition. A claim is exhausted if it was "fairly presented" in state court. <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971). "Fair presentation" means that the claim raised in federal court is the "substantial equivalent" of the state court claim. <u>Evans v. Court of Common Pleas</u>, 959 F.2d 1227, 1231 (3d Cir. 1992).

In his June 28, 2010 PCRA petition, Mr. Gonzalez presented all of the after-discovered evidence claims and the governmental interference claims that have been outlined above, in Subsection B of the Factual History. The Philadelphia Common Pleas Court denied post-conviction relief and the Superior Court affirmed the lower court's

decision. The Pennsylvania Supreme Court subsequently denied Mr. Gonzalez' Petition for Appellate Review.

Importantly, the PCRA Court denied post-conviction relief on procedural grounds, without conducting an evidentiary hearing and without making any credibility determinations regarding any of the facts set forth in the affidavits submitted by Petitioner in conjunction with his 2010 petition. (Opinion, Byrd, J., Exhibit "B"). Accordingly, the factual averments contained in these affidavits come before this Court unencumbered with any state court determination regarding their veracity.

### B.  Mr. Gonzalez' October 17, 2013 PCRA petition

As has been explained, the specific after-discovered evidence set forth in Mr. Gonzalez' October 17, 2013 PCRA petition has not yet been the subject of a state court ruling. However, as will be seen, the new evidence presented in Mr. Gonzalez' most recent PCRA petition is closely related to and intertwined with the exhausted, 2010 after-discovered claims now before this Court.  Accordingly, Mr. Gonzalez asks this Court to consider whether the new evidence discovered in 2013 would more appropriately be deemed *supplemental* to his already exhausted 2010 claims, and therefore cognizable by this Court, even in the absence of state court review.

Where the substance of a claim has been fairly presented in the state court, the facts presented in support of the claim may be supplemented in federal court. Vasquez v. Hillery, 474 U.S. 254, 257-60 (1986) (supplemental facts presented in support of grand jury discrimination claim "did not fundamentally alter the legal claim already considered by the state courts"); Blanco v. Singletary, 943 F.2d 1477, 1506 (11th Cir. 1991) (approving district court's holding of federal evidentiary hearing to supplement state

court record); <u>Cave v. Singletary</u>, 971 F.2d 1513, 1516-17 (11th Cir. 1992) (same); <u>Evans</u>, *supra*, 959 F.2d at 1231-1233. Here, Petitioner contends that the treatment accorded by the state courts to the issues raised in his June 28, 2010 petition was extremely superficial and that those courts' decisions are "contrary to" or "an unreasonable application of" clearly established law, or involve an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)-(2). As a consequence, with respect to his new October 17, 2013 petition, he believes that the state courts will follow their nearly universal, time-consuming practice in non-capital cases, i.e., dismissal of the PCRA petition without an evidentiary hearing by the Philadelphia Court of Common Pleas, followed by an affirmance by the Superior Court in an unpublished opinion, followed by the denial of appellate review by the state Supreme Court.

When a claim has been exhausted on direct appeal or in one round of state post-conviction proceedings, it need not be re-presented to the state courts in any subsequent proceedings. <u>Castille v. Peoples</u>, 489 U.S. 346, 350 (1989). Petitioner asks this Court to consider the evidence newly discovered in 2013 to be supplemental to the evidence submitted to this Court in 2010.

## V. <u>Federal Jurisdiction</u>

Mr. Gonzalez recognizes that, under <u>Herrera v. Collins</u>, 506 U.S. 390 (1993), a federal court will not review the constitutionality of a state court's denial of a new trial, where the petitioner's 2254 claim is solely based on after-discovered evidence. Here, however, all of Mr. Gonzalez' after-discovered evidence claims stem from the original failure of the Commonwealth to disclose the identity of Alec Hector and the substance of its pre-trial interactions with Hector. As the after-discovered evidence set forth above

demonstrates, the police knew, or had very strong reason to believe, that Alec Hector was the anonymous caller. For reasons that still have not been disclosed, they interviewed him while the parties were picking the jury for Petitioner's trial. (Affidavit, Alec Hector; R.R. at 84a) (Investigation Interview Record, at p.3; R.R. 86a). They did not disclose Hector's identity to the defense and they did not provide the defense with a copy of his signed statement. As a consequence, the defense could never conduct any follow up investigation.

Many years later, when Appellant was no longer represented by counsel, he received a copy of the discovery materials in this case, which for the first time included Hector's interview with the police. Only then did he learn that the police knew or suspected that Hector made the call. When Appellant learned of the potential connection, a family member contacted Hector and secured Hector's Affidavit.

Virtually all of the above-described new evidence has been developed by Petitioner as a result of learning that Hector was the "anonymous" caller who falsely told the police that Petitioner had confessed to the robbery murder. Had the Commonwealth informed him of Hector's connection to this case, Petitioner could have conducted the type of pre-trial investigation that would have demonstrated that Hector was, in all likelihood, the actual perpetrator of this offense.

This case is further complicated by the false testimony provided at trial by Officer Holman. Despite the failure of the state courts to allow an evidentiary hearing, Petitioner has made a prima facie showing that, contrary to his testimony, Holman was present at the crime scene and knew identity of the allegedly anonymous caller. (Crime Scene Log, Line 11; R.R. at 83a) (Affidavit, Alec Hector; R.R. at 84a).

The Supreme Court has explicitly held that the state's knowing use of perjured testimony to obtain a conviction violates the Fourteenth Amendment. <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972); <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959); <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976). "The same is true when the government, although not soliciting false evidence, allows it to go uncorrected when it appears at trial." <u>United States v. Biberfeld</u>, 957 F.2d 98, 102 (3d Cir. 1992). Accordingly, a 2254 petitioner can sustain a claim of constitutional error, where he demonstrates that a Commonwealth witness perjured himself and that the prosecution knew or should have known of his perjury. <u>Lambert v. Blackwell</u>, 387 F.3d 210, 249 (3d Cir. 2004); <u>Abdus-Samad v. Bell</u>, 420 F.3d 614, 625 (6th Cir. 2005) ("A false-testimony claim is cognizable in habeas because the 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice'").

In the instant case, the trial court denied Petitioner's request for an evidentiary hearing on this claim. As a result, Mr. Gonzalez has no way of knowing whether the specific district attorney who prosecuted him was personally aware that, while she was picking a jury to try Petitioner, the assigned detective was interviewing Alec Hector in the District Attorney's offices. Nevertheless, the assigned detective was definitely aware of this information and had an obligation to provide it. *See* <u>Giglio</u>, *supra*, 405 U.S. at 154 ("whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor"). Similarly, Officer Holman was aware that he was, in truth, at the scene of the crime and that he was, in truth, aware of the identity of the "anonymous" caller.

A comparable situation is presented in <u>Agurs</u>, *supra*. In <u>Agurs</u>, the Court determined that due process can be violated, if the state deliberately conceals an eyewitness to a crime. There, the Court conditioned relief upon a showing that the missing witness' testimony might have created a reasonable doubt. <u>Agurs</u>, 427 U.S. at 112 n. 21 (1976); *see also* <u>Lockett v. Blackburn</u>, 571 F.2d 309, 314 (5th Cir. 1978); <u>Freeman v. State of Georgia</u>, 599 F.2d 65, 68 (5th Cir, 1979). Given the contents of the affidavits presented here, Mr. Gonzalez has made such a showing.

In sum, due process demands that a criminal defendant be afforded a fair opportunity to defend against the State's accusations. Meaningful adversarial testing of the State's case requires that a defendant cannot be prevented from raising an effective defense. This right must necessarily include the opportunity to present relevant, probative evidence. As the Court explained in <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986), "an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence."

The failure of the Commonwealth to disclose Alec Hector's identity and to reveal Officer Holman's true role in the investigation of this offense compromised Petitioner's due process right to present a defense and to conduct meaningful pre-trial investigation. In the next section, Petitioner details the significant difference that disclosure of this information would have meant to the outcome of Petitioner's trial.

## VI.   The After-Discovered Evidence

### A.  The significance of the new evidence

The state courts have refused to conduct an evidentiary hearing regarding Petitioner's after-discovered evidence claims.  They have done so, even though Petitioner has, at a minimum, prima facially demonstrated the following:

1.   Contrary to his trial testimony, Officer Holman—the police officer who received the supposedly anonymous phone call—was actually present at the February 29 crime scene.

2.   Contrary to his trial testimony, the Officer Holman was actually aware that Alec Hector was the anonymous caller.

3.   Although his name appeared nowhere in any police paperwork disclosed to the defense prior to trial, the police interviewed Alec Hector in the offices of the District Attorney during jury selection.  They did not disclose his identity to the defense and have never explained why they suddenly decided to interview him, specifically about the anonymous call, on the eve of trial.

4.   According to Alec Hector's affidavit, Gabriel Gonzalez never told Hector that he had committed the murder.

5.   Mr. Hector himself was a likely suspect in the murder for which Mr. Gonzalez was convicted and was afraid that he would be viewed as such by the police.

6.   A police officer who witnessed the flight of the robber subsequently acknowledged that Gabriel Gonzalez was not the man he saw running.

7.   A piece of incriminating physical evidence discovered by the police in Mr. Gonzalez' home did *not* belong to Mr. Gonzalez.

8. Prior to the robbery/murder, Alec Hector spoke to Clifford Terlonge in the neighborhood where the crime occurred and told Mr. Terlonge that he intended to commit a robbery.

9. Prior to the robbery/murder, Alec Hector was wearing red hoodie and had an afro hairstyle—an appearance that matched the description of the shooter provided by each of the eyewitnesses to the shooting.

10. After the murder, at the crime scene, Clifford Terlonge provided information to Officer Holman, which would have enabled the officer to locate and interview Alec Hector.

In addition, as of this writing, the following questions remain unanswered:

1. Why did the police suddenly feel the need, a year after the incident and on the eve of Petitioner's trial, to interrogate Hector about whether he made the anonymous call?

2. If the call truly was truly anonymous, how did the police know to question Hector as the potential caller?

3. Did the police choose to interview Hector (as opposed to anyone else) because they (or at least Officer Holman) knew all along that he was the caller?

4. Why did the police and the Commonwealth fail to provide a copy of Hector's police statement to the defense?

5. Why did Officer Holman deny being at the crime scene?

Given the substance of Hector's Affidavit, the PCRA court should have conducted an evidentiary hearing to determine the answers to these troubling threshold

questions. At a minimum, the implications for the truthfulness of the police testimony at Petitioner's trial and suppression hearing are obvious.

Here, unlike other cases where a defendant has alleged governmental interference as a basis for habeas relief, no state court has ever ruled upon the credibility of any of the affiants who have given statements favorable to the defense. *Compare* <u>Lambert v. Blackwell</u>, 387 F.3d 210, 250 (3d Cir. 2004) (state PCRA court reasonably determined that state witnesses had not given perjured testimony at defendant's trial). Under these circumstances, this Court has the right to conduct a hearing and to make such credibility determinations in the first instance.

Where Petitioner's inability to present the above-described evidence at trial stemmed from the Commonwealth's failure to apprise him both of Alec Hector's actions and of the true nature of Officer Holman's role in the investigation, this Court should award Petitioner an evidentiary hearing.

**B. The evidence would have affected the outcome of Petitioner's trial**

It will typically be argued by the Commonwealth that the evidence of guilt in this (or any) case is "overwhelming" and that, as a result, any failure to turn over discovery or any new evidence that the defendant might have uncovered could not have affected the outcome of the trial. In support of this claim, two pieces of trial evidence will be relied upon: Petitioner's confession and the container for a .45 caliber firearm recovered by the police in Petitioner's parents' home. For the following reasons, these pieces of evidence are not so determinative as to preclude the reasonable likelihood of a different verdict, *if* the defense had been apprised of the identity of Alec Hector.

It must be noted, preliminarily, that the resolution of this question requires this Court to adopt a different approach than that typically employed by reviewing courts in other types of appeals. On direct appeal, questions concerning the strength of the prosecution's case and the credibility of its witnesses are rarely subject to review. The jury has already assessed the strength of the case and reached a determination. However, where a reviewing court must gauge the impact of new evidence upon the outcome of the case, the strength of the prosecution's original case must be reconsidered. United States v. Bagley, 473 U.S. 667, 681-682 (1985) (requiring a reviewing court to determine whether undisclosed would create the "reasonable probability" of a different result). Viewed in this light, neither the confession nor the gun container would necessarily "trump" the new evidence that Mr. Gonzalez would be able to present at a new trial.

1. *Petitioner's post-arrest statement*

For the purposes of the following argument, Petitioner does not ask this Court to determine that his statement is false in whole or in part. Rather, he asks this Court to conclude that this piece of evidence is legitimately questionable and that it is not, by itself, so powerful that it negates the reasonable likelihood of a different trial outcome.

Even without the new evidence of Officer Holman's misleading testimony regarding the anonymous call and Alec Hector's pre-crime statements to affiant Clifford Terlonge, there have always been substantial reasons to question the validity of the eight page confession extracted by the police from the 18 year old Petitioner after six hours of questioning. (N.T. at 1006-1019). In addition, the clothing Mr. Gonzalez "admitted" wearing during the robbery did not match the description of the man with a gun, whom the witnesses saw running from the scene. (N.T. at 1014).

Even more telling were Mr. Gonzalez' actions and appearance, some 40 minutes after the police concluded their interrogation. At that time, Petitioner immediately informed defense attorney Steven Serota that the statement was false. (N.T. at 662). He also informed the attorney that he had been choked by an interrogating officer. (N.T. at 662). At trial and at the pre-trial suppression hearing, Mr. Serota testified that he observed a pronounced "very red" mark running along the length of Appellant's neck, "from hairline to hairline." (N.T. at 662).

A confession is often considered unassailable evidence of guilt. As Judge Hawkins' concurring opinion in <u>Lunbery v. Hornbeak</u>, --- F.3d ----, WL 2039001 (9th Cir. 2010) observed, "[Defendant] had confessed and it is hard to imagine anything more difficult to explain to a lay jury." Yet, as Judge Hawkins went on to say, more and more laypersons and professionals now recognize the danger of such an assumption:

> After all, people do not just confess to crimes they did not commit, do they? Well, it turns out they sometimes do. Among the hundreds of persons exonerated of serious crimes through DNA testing are numerous individuals who earlier confessed.

*Id*. at *8 (Hawkins, J., concurring) *citing* <u>United States v. Hall</u>, 93 F.3d 1337, 1345 (7th Cir.1996) (recognizing the phenomenon of false confessions); <u>Boyer v. State</u>, 825 So.2d 418, 420 (Fla.Ct.App. 2002) (admitting expert testimony to explain the phenomenon of false confessions).

Here, when he was initially charged with retail theft, Mr. Gonzalez declined to give a statement. (N.T. at 522, 531). The police then interrogated the eighteen year old suspect for six hours, before he allegedly gave a voluntary confession to a homicide. Petitioner then immediately recanted this statement to an attorney who simultaneously observed a pronounced red mark around his neck. (N.T. at 662). Under these

circumstances, a confession elicited after such an interrogation does not automatically outweigh the impact of the new evidence that, due to governmental interference, Petitioner was never able to present.

### 2. *The gun container in Petitioner's home*

At trial, the Commonwealth also relied heavily on the gun container recovered in Petitioner's home. Because the police also recovered a .45 caliber fired cartridge casing in the backseat of the decedent's car, the Commonwealth used the gun container to prove that Petitioner had access to a gun of the same caliber as that used to commit the crime.

Yet, for the following reasons, the mysterious appearance of the .45 caliber fired cartridge casing ("FCC") in the back seat of the decedent's car has always been a disturbing aspect of this case. Whether it is the first officer on the scene, or the assigned detective, or in particular the crime scene technician, all police personnel are well aware of the importance of identifying ballistic evidence at the scene of a shooting. Thus, it is surprising that no police paperwork indicates that *any officer* observed the FCC, while the car where the murder occurred remained parked at the scene of the crime.

On February 29, 2000, at 11:42 p.m., Police Officer Joseph McGarrey was the first officer to respond to the crime scene at 6015 N. 5th Street. Arriving at the scene within minutes of the incident, Officer McGarrey looked inside the victim's car and made note of several items located in and around the vehicle. He did not report seeing a fired cartridge casing. Indeed, he affirmatively stated that he did *not* "observe any ballistic evidence at the scene." (Investigation Interview Record, Police Officer Joseph McGarrey, at 1-2). (A copy of Officer McGarrey's post-incident interview is attached here as Exhibit "H".)

Similarly, assigned homicide detective Gross also investigated the interior of the vehicle. Like Officer McGarrey, Detective Gross made note of the specific physical evidence that he observed. In an "Activity Sheet" that he subsequently prepared describing the crime scene, he memorialized what he had seen in the vehicle. The detective's activity sheet nowhere indicates that he observed an FCC. (Activity Sheet, Detective Gross, at 1) (A copy of Detective Gross' activity sheet is attached here as Exhibit "I".)

Finally, Officer Verrachio prepared a property receipt for the victim's car at 1:00 a.m. on March 1, 2000, when the police confiscated it at 6015 N. 5th Street. Like Officer McGarrey's report and Detective Gross' activity sheet, Officer Verrachio's property receipt says nothing about the presence of an FCC. Although his property receipt states that there was broken glass lying on the back seat, Officer Verrachio nowhere claims to have seen the FCC, which was also allegedly in the back of the vehicle. (Property Receipt 2256127). (A copy of Officer Verrachio's property receipt is attached here as Exhibit "J".)

In view of the above, crime scene technician Trenwith's time-of-trial assertion that he did, in fact, make such an observation, is clearly questionable. It is difficult to believe that a technician—whose main job is to locate and preserve physical evidence— would fail to either photograph the FCC on the scene or to notify homicide detectives of its location. Importantly, when he arrived at the crime scene on March 1, 2000, at 1:15 a.m., Trenwith did, in fact, take photographs of the broken glass on the rear seat of the decedent's car. (N.T. 792, 798-800, 820). Thus, if he did, in reality, see the FCC in the back of the vehicle, his decision to forego photographing it is incomprehensible.

Obviously, although it can be a critical piece of evidence, a fired cartridge casing is very small. In addition, because it is cylindrical in shape, it can easily roll. Thus, it is even more bizarre that, upon observing the FCC, the crime scene technician would allow a car containing such an important piece of evidence to be towed, without first photographing and confiscating the FCC. Yet, such was the testimony of crime scene technician Trenwith at Petitioner's trial. Significantly, Trenwith never claimed that, in the dark, he simply failed to see the FCC at the scene of the crime. Rather, according to Trenwith, he saw the FCC, but simply assumed that everything would still be just where it was the following night, when he intended to go to the police garage to re-examine the car. (N.T. at 822-823, 827).[6]

Importantly, Trenwith testified that, on "the following night," he returned to the police garage to examine and photograph the car. (N.T. 795). In the meantime, at 1:05 p.m. in the afternoon of the following day (March 2, 2000), other police officers searched Petitioner's home. (Property Receipt 2241095). (A copy of Property Receipt 2241095 is attached here as Exhibit "K".) Thus, it was only after the recovery of the container for a .45 caliber firearm in Petitioner's home, that Trenwith decided to remove the .45 FCC from the car.

None of this makes sense. At a minimum, it is equally plausible that the FCC was not, in fact, in the car when the car was still at the crime scene.

To repeat, Mr. Gonzalez does not ask this Court to conclude that his statement was coerced or that that the .45 caliber FCC was not really in the car, at the crime scene.

---

[6] The crime scene was in North Philadelphia, at 6015 N. 5th Street. (Property Receipt, Exhibit "J", at 1). The police garage is in South Philadelphia, near the Platt Bridge.

He simply argues that neither his alleged statement nor the ballistic evidence constitutes overwhelming proof of his guilt, to the degree that there is no reasonable likelihood of a different verdict.

**VII.  Petitioner's Claims are not Procedurally Defaulted**

The state courts have concluded that Mr. Gonzalez' claims are untimely.  They have also concluded that the new evidence does not entitle him to relief, because it would only be used to impeach the witnesses against him.  Both of these determinations are unreasonable.

Although he filed it more than one year after his conviction, Mr. Gonzalez' petition is timely.  42 Pa.C.S.A. § 9545(b)(1)(ii) creates an exception to the normal one-year period, where the defendant pleads and proves that the facts upon which his claim is predicated were unknown to the him and could not have been ascertained by the exercise of due diligence.  Where a PCRA petitioner files his petition within sixty days of the discovery of the previously unavailable evidence, the PCRA court has jurisdiction to entertain his claims.  42 Pa.C.S.A. § 9545(b)(2).

Here, Mr. Gonzalez averred that the evidence underlying this petition was unavailable prior to April 29, 2010.  Only on that date, did Alec Hector agree to supply a sworn statement acknowledging his conduct, exonerating Petitioner, and confirming that the police testimony provided at Petitioner's trial was false.  Affidavit, Alec Hector (4/29/10) (R.R. at 84a).  If the PCRA court had granted an evidentiary hearing, Mr. Gonzalez stood ready to prove the averments set forth in his petition.

Where, for the first time, a material witness signs an affidavit relating new facts after the statutory year has elapsed, such an allegation "brings a PCRA petition within the

permissible time limitations found in 42 Pa.C.S.A. § 9545(b)(1)(ii)." Commonwealth v. Burkhardt, 833 A.2d 233, 236 (Pa. Super. 2003). Moreover, where the after-discovered witness has hitherto exercised his right to remain silent regarding evidence which could incriminate him, a PCRA litigant meets the statutory requirement that the after-discovered evidence must previously have been unavailable. *See* Commonwealth v. Fiore, 780 A.2d 704, 711 (Pa. Super. 2001) (Trial court correctly ruled that codefendant's invocation of his Fifth Amendment rights made him unavailable at defendant's trial and that codefendant's subsequent statement constituted after-discovered evidence); *See also* Commonwerralth v. Bonaccurso, 431 A.2d 343, 344 (Pa. Super. 1981). Here, where Mr. Gonzalez brought the newly discovered evidence before the PCRA court within sixty days of its discovery, that court should have entertained his petition. Commonwealth v. Gamboa-Taylor, 753 A.2d 780, 784 (Pa. 2000).

Prior to Petitioner's trial, the defense was unable to investigate Mr. Hector's connection to the anonymous call because the Commonwealth never informed the defense that the police believed that Alec Hector was the person who placed the anonymous call. Yet, on February 7, 2001, even as jury selection was taking place in Petitioner's trial, the police were simultaneously questioning Mr. Hector about whether he made this call. Investigation Interview Record, Alec Hector (2/7/01) (R.R. at 86a).

The Commonwealth never turned this 75-483 over to the defense. As a consequence, the defense could never conduct any follow up investigation. Many years later, when Petitioner was no longer represented by counsel, he received a copy of the discovery materials in this case, which for the first time included Hector's 75-483. Only then did he learn that the police suspected Hector of making the call. When Petitioner

learned of the potential connection, a family member contacted Hector and secured Hector's Affidavit. As the Commonwealth has acknowledged, Mr. Gonzalez filed the instant petition within 60 days of securing Hector's affidavit. Motion to Dismiss, at 25.

Under these circumstances, Mr. Gonzalez cannot be penalized for his failure to secure this evidence sooner. Whether or not Hector's affidavit constituted Brady material, the Commonwealth concededly did *not* alert Petitioner and his counsel that the police had reason to interrogate Hector about whether he made the purportedly anonymous call.[7] In the last analysis, it does not matter whether the 75-483 constituted Brady material. The key consideration is that the Commonwealth knew about Hector and the defense did not. Accordingly, if the defense only discovered Hector's connection to the case many years later, any new evidence derived after that discovery fits within the exceptions to the one-year rule set forth in the PCRA statute.

In proceedings before the PCRA court, the Commonwealth argued for dismissal because Mr. Gonzalez "failed" to explain why Hector did not come forward sooner. Commonwealth's Motion to Dismiss, at 26 (citing Commonwealth v. Yarris, 731 A.2d 581 (Pa. 1990)). However, the law imposes no such duty on a PCRA petitioner. Hector had no legal duty to come forward sooner. Nor is there any reason to suppose that he would do so on his own. If he had done so, he would have had to willingly admit: (1) that the information he provided to the police in his 2001 75-483 was false; and (2) that in 2000 he falsely implicated another person in a murder. Clearly, a PCRA petitioner is only required to demonstrate why *he* did not know about the new evidence earlier. He

---

[7] The Commonwealth's Response attempts to justify the prosecutor's failure to disclose Hector's 75-483 on the grounds that it was not Brady material. *See* Motion to Dismiss, at 16-17.

has no obligation to explain why some other possessor of this new evidence did not make it available sooner, *sua sponte*.[8]

After denying an evidentiary hearing, the PCRA court's Opinion simply states, without any explanation, that "Gonzalez has failed to establish that this information could not have been obtained earlier." (Opinion, Exhibit "B", at 5). In its Opinion, the PCRA court has also discounted the significance of Hector's affidavit, because it would *only* be used to "impeach the credibility of the police and their investigative efforts." (Opinion, Exhibit "B", at 4). This argument seriously misapprehends the distinction between simply impeaching the credibility of a witness and demonstrating that a key piece of evidence used to convict a defendant was, in actuality, a deliberate falsehood on the part of the police. The testimony of a witness is "impeached" whenever the opposing party simply demonstrates a shortcoming in the witness' powers of perception, capacity to remember, ability to communicate accurately and honesty or integrity. *See* Commonwealth v. Gwaltney, 442 A.2d 236, 241 (Pa. 1982); Commonwealth v. Hamm, 378 A.2d 1219, 1226 (Pa. 1977); (McCormick, Evidence, § 44 (4th ed. 1992). By contrast, in this case, Petitioner's new evidence indicates that the investigating officers engaged in deliberate misconduct that was "intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." Such conduct "signals the breakdown of the integrity of the judicial proceeding" and constitutes something far more serious

---

[8]     Ironically, in the PCRA court, the Commonwealth's timeliness argument leaned heavily on the Supreme Court's opinion in Commonwealth v. Yarris, 731 A.2d 581 (Pa. 1990). *See* Motion to Dismiss, at 14, 24. In that case, over the course of many years, the Commonwealth raised procedural objections to the DNA testing which ultimately exonerated the defendant.

than the mere impeachment of an adverse witness.  <u>Commonwealth v. Smith</u>, 615 A.2d 321, 324-325 (Pa. 1992).

If police witnesses misrepresented the evidence leading to Petitioner's arrest and statement and if police officers deliberately withheld the name of a witness who could have shown that certain officers were giving deliberately false testimony, we are dealing with something far more serious than mere impeachment.  Under these circumstances, the lower court should have conducted an evidentiary hearing.  It should not have denied Petitioner's petition on technical timeliness grounds.

In affirming the PCRA court's denial of relief, the Superior Court has simply repeated the conclusory remarks in the lower court's Opinion.  (<u>Memorandum Opinion</u>, Exhibit "C", at 9).  To the lower court's rationale, the Superior Court has added a factually incorrect determination never relied upon below.  According to the Memorandum Opinion, "The record indicates that Appellant knew Hector's identity prior to trial, and the Commonwealth provided him with a copy of Hector's interview, in which Hector denied being the anonymous caller."  (<u>Memorandum Opinion</u>, Exhibit "C", at 9).  This is simply wrong.  The Commonwealth never made such a claim and never explained why it failed to provide the defense with a copy of Hector's interview.

**Conclusion**

In its efforts to dispose of the overwhelming number of (often frivolous) PCRA petitions with which it must contend, the Philadelphia Courts of Common Pleas rarely conduct evidentiary hearings in PCRA proceedings—particularly in those which do not involve the death penalty.  Thereafter, the Superior Court typically affirms in an unpublished opinion, without seriously discussing the merits and without permitting the

oral argument to which all direct-appeal defendants are entitled. After the Superior Court denies relief, the Pennsylvania Supreme Court denies appellate review. As a result, despite the burdens placed upon them by AEDPA, life-sentenced defendants often get the first thorough review of their post-conviction relief claims in the context of a 2254 petition.

Petitioner Gabriel Gonzalez respectfully requests this Court to conduct the evidentiary hearing he has consistently been denied and to award him a new trial.

Respectfully submitted,

_____

PAUL M. GEORGE
*McKinney & George*
239 South Camac Street
Philadelphia, PA 19107
(215) 735-0598
pgeorge@mckinneyandgeorge.com

Attorney for Gabriel Gonzalez

## CERTIFICATE OF SERVICE

I certify that on the date indicated below, I served a copy of the attached Memorandum of Law  and accompanying exhibits on the below named individual *via* electronic filing.

Thomas Dolgenos, ADA
Chief, Federal Court Litigation
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499


Date:  October 30, 2013                    *s/Paul M George*_____
                                           Paul M. George, Esquire