IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GABRIEL ROBERT GONZALEZ,  :  CIVIL ACTION
    Petitioner,  :
      :
    v.  :
      :
RANDALL BRITTON, et al.,  :  NO.  09-2029
    Respondents.  :

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE          April 25, 2018

    Before the Court for Report and Recommendation is the petition of Gabriel Robert Gonzalez, also known as Gabriel Gonzales ("Gonzalez" or "Petitioner"), a prisoner incarcerated at the State Correctional Institution in Houtzdale, Pennsylvania for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.[1]  Petitioner is serving a life sentence of imprisonment following his murder conviction in the Philadelphia Court of Common Pleas.  By his counseled amended petition, he seeks habeas relief on three grounds relating to alleged coercion used to procure his confession, counsel's failure to present character evidence at trial, and counsel's failure to object at trial to evidence of an unrelated retail theft Gonzalez committed a day after the homicide. For the reasons set out below, we recommend that the petition be denied.

---

[1] Although Petitioner is currently confined within the Western District of Pennsylvania, which includes Clearfield County, *see* 28 U.S.C. § 118(c), venue is proper here pursuant to 28 U.S.C. § 2241(d) in that his confinement grew out of a prosecution and conviction in a Court of Common Pleas within the Eastern District of Pennsylvania.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[2]

Gonzalez was convicted on February 21, 2001 by a death-qualified jury in the Philadelphia Court of Common Pleas of second-degree murder, robbery, and possession of an instrument of crime relating to the February 29, 2000 fatal shooting of Vincent Green.   The Honorable David N. Savitt presided over an extensive suppression hearing as well as the trial, at which Petitioner was represented by Tariq El-Shabazz, Esquire.

---

[2]   Our statement of the factual background of this petition derives from the appellate court decisions on direct appeal and PCRA review:  *Commonwealth v. Gonzales*, No. 2019 EDA 2001 (Pa. Super. Ct. Aug. 7, 2002) ("*Gonzales-I*"), and *Commonwealth v. Gonzalez*, No. 1586 EDA 2007 (Pa. Super. Ct. Aug. 18, 2008) ("*Gonzalez-II*").   These opinions can be found attached to the initial response (Doc. 9) as well as included in the Appendix provided by Petitioner at Doc. 63.   We also consulted the notes of testimony of the suppression hearing and trial, which were provided by the Court of Common Pleas and which are also included in Petitioner's Appendix (Doc. 63).

There have been several rounds of briefing in this case, as proceedings were stayed for a period of time and as counsel was appointed in 2013 and substituted in 2016.   Accordingly, in preparing this Report and Recommendation, we have reviewed:  the *pro se* form § 2254 petition completed by Petitioner on May 1, 2009 (Doc. 1); the accompanying Concise Memorandum in Support of Habeas Corpus (Doc. 1-2); the Response to Petition for Writ of Habeas Corpus filed by the Philadelphia District Attorney's Office on September 11, 2009, with appended exhibits (Doc. 9); Petitioner's reply to the District Attorney's response (Docs. 16-17); Petitioner's request to add a new constitutional claim based on newly discovered evidence docketed on May 24, 2010 (Doc. 20); the counseled Memorandum in Support of Petition for Writ of Habeas Corpus, with appended exhibits (Doc. 33); the Response to Amended Petition filed by Respondents on December 16, 2013, with exhibits (Doc. 34); Petitioner's Reply to that response, filed on March 20, 2014 (Doc. 35); the second counseled Amended Petition, with exhibit, filed on July 25, 2016 (Docs. 55-56); the Memorandum in Support of that petition, filed on December 15, 2016, with exhibits (Docs. 61, 63); Respondents' Response to that petition, with exhibit, filed on April 19, 2017 (Doc. 68); Petitioner's reply brief, filed on June 2, 2017 (Doc. 71); Respondents' sur reply, filed on June 6, 2017 (Doc. 74); and the trial court record provided by the Clerk of the Court of Common Pleas on July 1, 2009 ("St. Ct. Rec."), and as supplemented by Respondents on April 13, 2010, at the request of the Court, with a copy of the notes of testimony from February 2001 (Doc. 19).

## A.  Factual overview

On March 1, 2000, Philadelphia police were summoned by a store security guard after a shopper had walked out of the store with a pair of sneakers for which he had not paid.  The security guard pointed out the man — Gonzalez — who was then sitting in a parked car just outside the store.  As the store wished to prosecute the theft, the police officer arrested Gonzalez for retail theft and took him into custody.

Gonzalez declined to give a statement to police about the theft and remained in custody overnight at the local precinct.  During that time, in the early morning hours of March 2nd, a call came into that precinct that was brought to the attention of local detectives.  As a result of this anonymous call, Gonzalez was transferred to the homicide unit at the Police Administration Building and given over to Detective William Gross, who was investigating the homicide of Vincent Green.  Green, a pizza delivery driver, had been shot in the chest at point-blank range at his car after 11:00 p.m. on February 29, 2000, shortly after he left the pizza shop where he worked to make a delivery.  As the shop manager described to police, he heard a gunshot, glanced outside from the back of the store, and observed a man exit Green's car and flee.  Green managed to stumble back into the pizza shop but survived only a few hours.  When police inspected the car, they saw that the interior dome light had been ripped out so that the car would not light up when the door was opened.

Detective Gross advised Gonzalez that he wished to speak with him regarding the murder of the pizza delivery man and advised him of his Miranda rights.  As Detective Gross later testified, Gonzalez responded that police "might find his fingerprints in the car because the guy asked [him] to fix his inside light."  (N.T. 2/14/01 at 943.)   Detective Gross then brought in a colleague, Detective Lawrence McGuffin, so that they could again read Gonzalez his rights and

3

then take a formal, typed statement, which they began at 4:45 a.m., according to their documentation. Detective Gross withdrew to allow Detective McGuffin to complete the interview with Gonzalez and type the statement.

As Detective McGuffin later testified, Gonzalez acknowledged to him that he had been drinking with a friend earlier on February 29 and then went home, where he retrieved a gun he owned, and after a while "just went out looking." Behind the pizza shop he saw the unlocked car with its dome light on and looked in. He then entered the rear seat and closed the door. He ripped out the dome light because it remained on even though he had shut the door. He saw that Green, whom he knew slightly from having ordered deliveries from the shop, was coming to the car. He hid in the backseat because he "couldn't get out of the car fast enough." When Green entered the car, Green saw Gonzalez lying in the backseat. Gonzalez jumped up with the gun in his hand. Green then threw money at Gonzalez. When it looked to Gonzalez like Green "was reaching towards me," he fired his gun once. Green ran out of the car. Gonzalez then took the money, which he believed was approximately $200, and fled. He ran down an alley towards the house where he lived with his parents, threw the gun in the backyard, and remained inside when he saw police searching the area. Detective McGuffin further testified that Gonzalez explained that he had stolen the sneakers the following day because he "felt so bad" for the murder and wanted to get caught. He contended that the shooting resulted from his being scared and from having had beers with a friend earlier in the evening and that he "didn't mean for this to happen." (N.T. 2/14/01 at 1010-11.) Gonzalez signed each page of his written statement and initialed additions and deletions. (Doc. 63-11 at pp. A1432-39.) He declined to give a statement on videotape. While there is no documentation of precisely when the interrogation concluded, this

signature on a form memorializing his non-consent to a video interrogation is dated March 2 at 10:30 a.m. (Investigation Interview Record, at Doc. 63-11.)

Based upon this statement, the police obtained and executed a search warrant at Gonzalez's home later that day. They found clothes consistent with his description of what he said he was wearing on the night of the shooting and the shoe box that he had described as his storage for the gun that he carried. They did not, however, recover his gun.

Prior to trial, Gonzalez sought to suppress his custodial statement. He asserted that he had requested an attorney and asserted his right to silence and that the statement was obtained by force and coercion. At a suppression hearing held on February 12-13, 2001 before the trial judge, the Commonwealth called witnesses to justify the validity of the statement. Detectives Gross and McGuffin testified about the circumstances under which Gonzalez gave his statement and denied any physical abuse or use of force. Gonzalez testified at the suppression hearing that Detective Gross punched him in the face twice and manually choked him in the interrogation room and that that was why he "told [him] what [he] want[ed] to hear." (N.T. 2/13/01 at 691-93.) He testified that the statement typed up by Detective McGuffin and signed by him represented some things that he said — although made up by him — and some embellishments made up by the police. (*Id*. at 695-98.)

The defense presented testimony at the suppression hearing from an attorney, Stephen Serota, Esquire, who had visited Gonzalez at the homicide unit on the morning of March 2nd at the request of his step-father, who was an acquaintance. Attorney Serota testified that he was permitted to see Gonzalez after the interrogation had concluded. Gonzalez confirmed to him that he had already given a statement to the detectives but claimed that he did so because the detectives had beaten and choked him until he confessed. While Serota, who had never

previously met Gonzalez, did not observe any marks on Gonzalez's face nor any bleeding or bruising, he did observe what he described as an abrasion about 3/8" thick around the front of Gonzalez's neck. (N.T. 2/13/01 at 654-63, 668.) Gonzalez's step-father, Kevin Clark, also testified about scratches in the area of Gonzalez's throat and ears that he observed a few days after the interrogation, when Gonzalez was in a local correctional center, and which he claimed had not been present before. (N.T. 2/12/01 at 631-35.) The suppression court, however, found the testimony of Detectives Gross and McGuffin concerning the circumstances of the interrogation and Gonzalez's waiver of his rights to be credible. The court concluded that Gonzalez was not abused and that he gave his statement voluntarily and freely. Accordingly, the court denied the motion to suppress. (N.T. 2/13/01 at 759.)

At trial, the Commonwealth presented evidence in accordance with its theory that this was "a robbery gone terribly bad," and that Gonzalez, having felt remorse from shooting someone he knew, wanted to confess to that crime. (N.T. 2/13/01 at 774.) As Attorney El-Shabazz later explained, the defense strategy was to show the jury that the confession was not credible because it was not voluntary, using the Commonwealth's own witnesses concerning the interrogation and testimony from Attorney Serota regarding Gonzalez's appearance immediately afterward. (*See, e.g.,* N.T. 5/11/07 at 89-90, 102, 118-19.) In accordance with his attorney's recommendation, Gonzalez did not take the stand in his own defense.[3] The only witnesses called

---

[3] Gonzalez did not have a criminal history and thus would not have been subject to impeachment for *crimen falsi.* As Attorney El-Shabazz later explained, however, he recommended against Gonzalez testifying at trial because he believed that Gonzalez had not made a good impression in his testimony before the suppression court. *See, e.g.,* 5/11/07 at 86. *See also id.* at 104 (opining that Gonzalez's testimony was "horrible" and that he had come across as not credible); *id.* at 104-05 (recalling Gonzalez's hesitancy, fidgeting, and hedging

*(continued…)*

in the defense case were Attorney Serota, regarding his observations around the time of the interrogation; Petitioner's younger brother, Dante Quarterbaum, who described the bedroom he shared with Petitioner, which was searched by police and described in their testimony; and a captain from the correctional institution where Petitioner was first brought, who testified to the brevity of the medical intake process at the institution.[4]

In his closing, defense counsel El-Shabazz urged jurors to recall incongruities in the Commonwealth's evidence, such as the pizza shop manager's description of the fleeing assailant and the appearance of Gonzalez; the prosecutor's theory that Gonzalez stole the sneakers to get caught yet his assertion of his right to remain silent when he was taken to the local precinct; the fact that the anonymous call came in after news of the homicide was publicized; the observations of Attorney Serota of a mark on Gonzalez's neck just after the interrogation; the lack of physical or forensic evidence linking Gonzalez to the crime scene; and the lack of any evidence of tampering with evidence at Gonzalez's home prior to its being searched. (N.T. 2/20/01 at 1237-1269.) The Commonwealth argued that the impulse to turn himself in and to confess was consistent with Gonzalez's humanity and his sense of guilt and fear after shooting someone he knew. The prosecutor contended that the few incongruities between Gonzalez's statement and the other evidence gave greater credibility to the detectives who took the statement and showed that it was not fabricated to match the evidence. She argued that the red mark observed by

---

during questioning at the suppression hearing, as well as his falling for traps on cross-examination).

[4] A nurse in the prison health service testified in the Commonwealth's case that he observed no injury to Gonzalez when he completed the medical intake process.

Attorney Serota following the interrogation was not an injury, as no one took any actions consistent with it having been inflicted by police. (*Id.* at 1269-1313.)

## B. Post-trial overview

The jury convicted Gonzalez of second-degree murder, along with burglary and possession of an instrument of crime. Gonzalez obtained new counsel for his direct appeal, in which he challenged the admission of his statement to police and evidence that an anonymous telephone call linked him to the Green homicide. He also asserted that Attorney El-Shabazz provided ineffective assistance in failing to object to the admission of evidence concerning his theft of the sneakers on March 1, 2000 and in failing to call character and alibi witnesses that had been made known to him.[5] After considering the merits of the various issues raised by Gonzalez and the affidavits or statements of his proposed witnesses, the Pennsylvania Superior Court affirmed the conviction. *Commonwealth v. Gonzales*, No. 2019 EDA 2001 (Pa. Super. Ct. Aug. 7, 2002) [Doc. 9, Ex. B] ("*Gonzales-I*"). The Pennsylvania Supreme Court denied allowance of appeal. *Commonwealth v. Gonzales*, No. 439 EAL 2002 (Pa. Sept. 3, 2004).

On or about February 9, 2005, Petitioner filed a *pro se* application for collateral relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. § 9541, *et seq.* Counsel was appointed and filed an amended petition alleging that Gonzalez was denied his right to testify at trial in that counsel advised him not to testify and allegedly interfered with his freedom to testify in his own behalf. The PCRA Court, the Honorable Sandy

---

[5] At the time of the direct appeal in Gonzalez's case, state procedural rules required challenges to the performance of counsel to be made at the first opportunity when the defendant had new counsel. The Pennsylvania Supreme Court subsequently required that claims of ineffective assistance be deferred until post-conviction proceedings. *See Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002).

L.V. Byrd, held an evidentiary hearing on May 11, 2007 at which Petitioner and Attorney El-Shabazz testified. The PCRA Court dismissed the petition on May 18, 2007. Petitioner appealed to the Superior Court, but that court affirmed. *Commonwealth v. Gonzalez*, No. 1586 EDA 2007 (Pa. Super. Ct. Aug. 18, 2008) [Doc. 9, Ex. D] ("*Gonzalez-II*"). The Pennsylvania Supreme Court again denied discretionary review. *Commonwealth v. Gonzalez*, No. 498 EAL 2008 (Pa. Jan. 16, 2009).

### C.     Habeas litigation

On or about May 1, 2009, Petitioner filed a *pro se* petition for a writ of habeas corpus, initiating this action. The four grounds for relief he identified in the form petition corresponded with claims presented on direct appeal and PCRA review: (1) "conviction obtained by use of coerced confession;" (2) "right to testify freely interfered with and right not afforded by trial court;" (3) "ineffective counsel," for not calling character witnesses and alibi witnesses; and (4) "ineffective counsel," for failing to object to testimony "connecting [him] to an unrelated retail theft." (Pet., Doc. 1, at 9-10.) In their answer filed on September 11, 2009, Respondents contended that none of the claims Gonzalez raised provide a basis for federal habeas relief. (Doc. 9 at 18, 22, 32, 39.) On February 22, 2010, Petitioner submitted a Reply, providing additional legal authorities and argument concerning his claims. (Docs. 16, 17.)

While this Court was still preparing its Report and Recommendation upon referral from the Honorable Anita B. Brody, in May 2010 Petitioner requested leave to add a "new constitutional claim based on newly discover[ed] evidence." (Doc. 20.) His claim asserted a violation of his right to due process as recognized in *Brady v. Maryland* where he claimed that the Commonwealth withheld exculpatory materials. Referring to the anonymous caller who implicated him in the shooting of Green, he asserted that officers knew that the caller was Alec

Hector, a young man who he claimed the police had interviewed shortly after the shooting as a person of interest based upon his likeness to the description of the person seen running from Green's car. Gonzalez complained that he was not given all of the information known to the Commonwealth concerning this caller and/or Alec Hector. In that Gonzalez had not presented a *Brady* claim to the state courts but demonstrated that he was seeking to do so via a second PCRA petition, we agreed to stay consideration of his habeas petition, as amended with this additional claim, while he pursued state court review. (*See* Docs. 21-25.)

During this time, Gonzalez requested that the Court appoint him counsel for his habeas proceedings. He specifically desired the attorney who had been representing him in his state court proceedings, Paul M. George, Esquire, and the Court granted his request in March 2013. Upon the conclusion of the state court proceedings regarding the purported *Brady* claim,[6] Attorney George filed in this Court a memorandum in support of Gonzalez's additional claim, arguing that the newly-discovered evidence showed that police witnesses deliberately withheld the name of a witness who could have shown that the officers gave deliberately false testimony. (Doc. 33.) The submission also indicated, however, that Gonzalez had recently become aware of further new evidence that had prompted him to file a *third* PCRA petition in the state courts on October 17, 2013. As Petitioner again wished to incorporate that new evidence into his habeas

---

[6] The PCRA Court, again Judge Byrd, found the second petition to be untimely and dismissed it. The court determined that Gonzalez did not satisfy the after-discovered evidence exception to the statutory time bar because the alleged after-discovered evidence was being used solely to impeach the credibility of witnesses — here, police officers and detectives — and because it would not likely compel a different verdict. The PCRA Court also found that Gonzalez could not meet the timeliness exception that applied to "governmental interference" because he did not establish that the evidence was unavailable to him earlier or that the evidence was material to guilt. *See* 42 Pa. Cons. Stat. § 9545(b)(1) (PCRA timeliness exceptions). The Superior Court affirmed, and the Pennsylvania Supreme Court denied review. *See* Doc. 33 at Exs. B, C.

petition, the case here was again stayed while Petitioner pursued PCRA relief and exhausted state court remedies.  (Docs. 34-36.)

When state court proceedings on the third PCRA petition concluded in 2016 and this matter was ready to resume, Attorney George sought leave to withdraw, citing personal needs. Gonzalez consented to a change of counsel, and the Court appointed the Office of the Federal Defender.  The Defender filed an amended petition on July 25, 2016 consisting of only the four claims in the original *pro se* petition from 2009.  (Doc. 56.)  A memorandum in support of the petition filed on December 15, 2016 winnowed the petition further, explicitly withdrawing Ground Two, the claim alleging that his "right to testify freely" was "interfered with" and "not afforded by [the] trial court."  (Doc. 1, Pet., at 9.)  Neither the amended petition nor the subsequent supporting brief filed by the Defender sought habeas relief for an alleged *Brady* violation nor assert any claim based upon the evidence presented to the state court in the 2010 and 2013 PCRA petitions.

Respondents filed their response to the amended petition on April 19, 2017.  (Doc. 68.) Petitioner filed a reply on June 2, 2017, and Respondents were given leave to file a sur reply on June 6, 2017.  (Docs. 71, 74.)  The matter is not ripe for review.[7]

## II.   LEGAL STANDARDS

Prior to our discussion of Petitioner's claims, we briefly set out the substantive standards applicable to federal habeas review and the constraints upon a federal court reviewing claims

---

[7]   Earlier this year, Gonzalez sent a letter to the undersigned complaining about the claims advanced (or omitted) by present counsel.  Gonzalez had also initiated *ex parte* communications with the Court when represented by Attorney George in 2014, 2015, and 2016, setting forth amendments or supplements he wished to make to his habeas petition.  We notified the parties of the recent communication.  Present counsel has advised the Court that after consulting with Petitioner, the concerns raised in his letter have been resolved.  *See* Doc. 79.

adjudicated in the state court. We then describe the standard employed by the United States Supreme Court for claims of ineffective assistance of counsel under the Sixth Amendment, the source of several of the claims upon which Petitioner seeks relief.

### A. Standards for state-adjudicated claims

When the claim presented in the federal habeas petition was adjudicated on the merits in the state courts, the federal court shall only grant habeas relief if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has clearly stated that a writ may issue under the "contrary to" clause of Section 2254(d)(1) only if the "state [c]ourt applies a rule different from the governing rule set forth in [United States Supreme Court] cases or if [the state court] decides a case differently than [the United States Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A writ may issue under the "unreasonable application" clause only where there has been a correct identification of a legal principle from the Supreme Court but the state court "unreasonably applies it to the facts of the particular case." *Id.* This requires the petitioner to establish that the state court's analysis was "objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

Where a petitioner challenges the factual predicate of a finding by the state court that resulted in the denial of a constitutional claim, the federal court cannot lightly set that factual determination. Rather, pursuant to the statute, state court factual findings are entitled to a

presumption of correctness absent "clear and convincing evidence" to the contrary. *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a State court shall be presumed to be correct" and that the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence").

**B.**    ***Strickland* standard for ineffective assistance of counsel**

Two claims advanced in the presented amended petition asserted ineffective assistance of counsel. The Supreme Court established the two-prong test to determine if a defendant was deprived of his Sixth Amendment right to counsel in *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland,* a petitioner alleging ineffective assistance of counsel must prove that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 668, 694.

To satisfy the first prong, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. A reviewing court should be "highly deferential" and must make "every effort... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Further, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*

To satisfy the second prong, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding.  *Id.*  It follows that counsel cannot be ineffective for failing to pursue meritless claims or objections.  *See, e.g., United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999); *United States v. Fulford*, 825 F.2d 3, 9 (3d Cir. 1987).

## III.  DISCUSSION

The counseled amended petition presently before the Court presents one ground for relief for alleged violations of his Fifth, Sixth, and Fourteenth Amendment rights relating to the introduction at trial of his statement to police, as well as two alleged violations of his Sixth Amendment right to counsel.  In Ground One, he contends that the police employed coercive tactics, including threats and physical force, to obtain from him a confession that should not then have been admissible at trial.  In Ground Three, he contends that trial counsel performed deficiently in failing to call numerous character witnesses to testify at trial.  Finally, in Ground Four, Petitioner asserts that counsel was ineffective in failing to object to testimony concerning his arrest for retail theft.[8]  Pursuant to 28 U.S.C. § 2254(d), we proceed to consider whether the

---

[8]  As we indicated above, in his original *pro se* petition, Gonzalez also sought relief on a claim described at Ground Two of the form, asserting that trial counsel interfered with his right to testify at trial.  That claim had been presented in his first PCRA petition and was the subject of an evidentiary hearing at which trial counsel testified candidly about the reasons he recommended against Gonzalez taking the stand.  One aspect of this counseling concerned Attorney El-Shabazz's position that "if, in fact, my client takes the stand, then his testimony cannot be perjurious based on what he had told me prior to testifying."  (N.T. 5/11/07 at 88.)  *See also id.* at 87-88 (referring to information that counsel "knew from him and his family" and "candid conversations" he had with his client "about the incident, various roles in the incident, be it disposal of weapons, be it what occurred, what didn't occur, et cetera").  Later in his testimony, in response to a direct question from PCRA counsel, he stated explicitly that Gonzalez had told him that he committed the crime and identified who had removed the gun so that it could not be found.  (*Id.* at 102-03.)

*(continued…)*

state court's rejection of each constitutional claim reflected reasoning that was contrary to or an unreasonable application of clearly established federal constitutional law, or, alternatively, whether the state court determination was based upon an unreasonable determination of the facts in light of the record developed in the state court.

### A.  Ground One: Claim of coerced confession

Gonzalez first raises a claim that his conviction was obtained by use of a coerced confession.  He contends that he was "physically forced" into giving a confession and that the state courts erred in admitting such a coerced confession.  (Doc. 61, Br. in Supp. of Am. Pet., at 12.)  He asserts that the fact that he sustained an assault during his interrogation is supported by physical evidence in the red mark that Attorney Serota observed on Gonzalez's neck when he met him just after the interrogation.  He contends that coercion is also evidenced by inconsistencies between his statement and other evidence, which he asserts demonstrates that he fabricated certain answers.  Finally, he contends that the coercive interrogation process he described is more credible than the account of the detectives.  He notes that he made a contemporaneous and prompt complaint that he had been hit and choked when Attorney Serota

---

Although this claim was still included in the amended petition filed by present counsel on July 25, 2016, *see* Doc. 56 at 8, present counsel explicitly withdrew it in the supporting memorandum filed on December 15, 2016.  *See* Doc. 61 at 9.  The claims that Gonzalez presented to the state court in his second and third PCRA petitions, which asserted a *Brady* violation regarding the withholding of allegedly known information regarding the identity of the anonymous caller as Alec Hector, which could discredit police officer accounts of the investigation, have not been advanced in either the counseled amended habeas petition filed in July 2016 or in the brief in support of the amended petition filed in December 2016 by the Defender.  *See* Docs. 56, 61.  In addition, the claim regarding the failure to call witnesses has been pared down to a claim only regarding character witnesses and omits the claim regarding alibi witnesses, who had been identified as Petitioner's step-father, Kevin Clark, and his "fiancée."  Present counsel appears to have carefully chosen the particular claims to advance in this proceeding, presumably to avoid some of the potential concerns identified by Attorney El-Shabazz.

met with him just after the interview concluded, and that his account of the interrogation has been consistent in testimony given at the suppression hearing and at a PCRA hearing years later. He contends that the detectives' account of the interrogation is, by contrast, inconsistent and unbelievable. He points to their contention that he stole the sneakers so that he could turn himself in, yet where he exercised his right to silence upon his theft arrest. He also finds suspicious the fact that the detectives did not document the length of the interrogation and questioned the credibility of the rationale given by Detective Gross for turning over the interrogation to Detective McGuffin. (Doc. 61 at 11-16.) He characterizes the suppression court's ruling, permitting the admission of a statement that was a product of unlawful coercion and not voluntary, as a violation of his Fifth Amendment privilege against self-incrimination and an error that cannot be deemed harmless. (*Id.* at 16-17.) Respondents contend that the state court reasonably determined that his confession was properly admitted based on its finding, "substantiated by abundant evidence," that the statement was given voluntarily. (Doc. 68 at 17-19, citing N.T. 2/13/01 at 759.)

Gonzalez sought relief on this claim in the state court on direct appeal. See Brief for Appellant, *Commonwealth v. Gonzalez*, No. 2019 EDA 2001 at 4 (filed Nov. 26, 2001) (Doc. 9 at Ex. A). The Superior Court reviewed some of its precedents setting forth the standards for the admission of a confession and noted that it was "exclusively within the province of the suppression court to determine the credibility of the witnesses and the weight to be accorded their testimony." *Commonwealth v. Gonzales*, No. 2019 EDA 2001 at 7 (Pa. Super. Ct. Aug. 7, 2002) [Doc. 9, Ex. B] ("*Gonzales-I*"). The court recited the following facts developed in the suppression hearing just before trial in 2001:

In the instant case, Appellant filed a motion to suppress his confession based on an allegation that the police choked and beat Appellant until he confessed. Detectives Gross and McGuffin testified they never beat, harassed, threatened, choked or abused Appellant in any way during the interrogation. (N.T. Suppression Hearing, 2/12/01, at 565-72, 597-600). Attorney Serota testified that when he met with Appellant following Appellant's statements to the detectives, Appellant informed Serota the detectives had beaten the confession out of him. Serota testified that he saw an abrasion around Appellant's neck, but did not see any bleeding or bruising on Appellant's face. Serota stated that he discussed the marks and allegations with Detective Gross, but he did not advise the Detective's superiors of the alleged beating. (*Id.*, 2/13/01, at 671-73). Finally, Appellant took the stand and testified that the detectives ignored his repeated requests for counsel, and had choked and beaten him until he confessed. He also asserted that the confession was false. (*Id.* at 691, 724-30.)

*Gonzales-I*, slip opin. at 7-8. The court noted that the issue of the voluntariness of Gonzalez's confession "was resolved through a credibility determination by the suppression court":

> The officers testified that they neither threatened nor beat Appellant during the interrogation. They also denied Appellant's allegation that he requested counsel during the interrogation. The suppression court found the detectives' story more credible than that of Appellant.

*Id.* at 8. The Superior Court thus "discern[ed] no reason to overrule the decision of the suppression court" to deny Gonzalez's motion to suppress. *Id.*

In order to determine whether a confession is voluntary and thus comports with notions of due process when evidence of it is presented at trial, the reviewing court must assess the totality of the circumstances under which the statement was taken, including the characteristics of the defendant and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The Supreme Court has identified factors as relevant to the question of voluntariness: the age of the defendant, his level of education, his intelligence, whether he was informed of his constitutional rights, the length of detention, the length and nature of

questioning, and the use of physical punishment such as the deprivation of food or sleep.  *Id*.  No single fact will control the question of voluntariness; rather, all relevant circumstances must be considered.  *Id*.  *See also Dickerson v. United States*, 530 U.S. 428, 433-34 (2000) (describing development of this standard).

We have reviewed the transcript of the suppression hearing and the evidence relied upon by the suppression court.  *See* N.T. 2/12/01 & 2/13/01 at 516-759.  The suppression court explicitly stated its finding that "the defendant was given his warnings, the defendant was not physically abused, his creature comforts were supplied, there were no promises or threats." (N.T. 2/13/01 at 759.)[9]  The suppression court credited the detectives' testimony that Gonzalez did not request counsel when initially questioned about the shooting of a pizza deliveryman.[10] *Id*.  We view these conclusions as factual findings subject to 28 U.S.C. § 2254(e)(1) on habeas review.  Pursuant to this standard, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant [for a writ of habeas corpus] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The circumstances to which Gonzalez points — the alleged physical evidence of an assault, the inconsistency of the statement he gave with the other evidence, and the inconsistency of the detectives' accounts between themselves and with his testimony at the hearing — do not

---

[9]  The trial court did not write an opinion post-trial.  *See* Br. for Appellant, *Commonwealth v. Gonzales*, No. 2019 EDA 2001, at Ex. A (confirming same) [Doc. 9, Ex. A].  Therefore, the reasoning for the Superior Court's ruling is found in the explanation given on the record in open court.

[10]  The court also noted that Attorney Serota was summoned not by Gonzalez but by his father, and that he did not arrive until after the statement was concluded.

amount to clear and convincing evidence that the suppression court's factual findings were incorrect. First, Gonzalez's claim of a physical assault is not corroborated by any photos or any complaints or contemporaneous documentation. While Attorney Serota testified that he observed a red abrasion around Gonzalez's neck, he did not document it in any way other than to report it to Gonzalez's stepfather. Moreover, the mark he described would not appear to corroborate the account Gonzalez gave of being punched in the face and choked manually, *i.e.*, not with a rope or other instrument. As was further developed at trial, Gonzalez did not complain of any abuse when his condition was documented at intake at the jail facility to which he was taken on March 3, and the nurse who performed his intake noticed no injuries.[11] To be sure, while a mark on Gonzalez's neck is visible in his arrest photo, the nurse testified at trial that he would not characterize such a mark as an injury. He also observed that at the time of trial in February 2001, the mark was still present on Gonzalez's neck, although it was not as pronounced as in the photo and to him resembled "wrinkles." (N.T. 2/15/01 at 1134, 1145.)[12] As to the consistency of Gonzalez's confession with the rest of the evidence and the consonance of the detectives' account as opposed to that of Gonzalez as to the events of March 2 during the homicide investigation, we see no evidence that would have required a finding that the confession was not voluntary.

---

[11] The facility to which Gonzalez was initially taken happened to be the one at which his mother was employed as a corrections officer.

[12] Arrest photos of Gonzalez dated March 1 and March 2, 2000 — presumably for the arrest in the retail theft case on March 1 and then for the homicide the next morning following his interrogation — are found in Petitioner's appendix at Doc. 63-11, ECF pp. 19-20. The photos show no change in Gonzalez's appearance aside from his attire: he wore a collared shirt in the March 1 photo and an undershirt in the photo taken on March 2.

On this record, we cannot say that the state court's admission of evidence of Gonzalez's confession was based upon an "unreasonable" determination of fact as described in 28 U.S.C. § 2254(d)(2). Similarly, we conclude that the Superior Court did not unreasonably apply federal constitutional law. *See id.*, § 2254(d)(1). Therefore, this claim, which was considered on direct appeal in the state court and adjudicated on the merits, cannot provide a basis for granting the writ.

**B.      Ground Three: Claim of ineffective assistance of counsel for failing to investigate, develop, and present character evidence**

Gonzalez next raises a claim that he received ineffective assistance when trial counsel did not call character witnesses who were readily available to testify as to his reputation for being peaceful and law abiding. (Doc. 61 at 18.) He argues that character evidence was important because one of the only ways to attack his confession was to show that his alleged actions were inconsistent with his reputation and his "good character." (*Id.*) He contends that there is a reasonable probability that, had the defense presented this evidence of his good character, the result of trial would have been different. He points to affidavits obtained in 2001 following his conviction and a new set obtained in 2016 through present counsel concerning the kind of person he was known to be in his community. (*Id.* at 21, citing Appendix [Doc. 63] at pp. A1411-30 and A1404-10.)

At the time of Gonzalez's trial, the Pennsylvania Rules of Evidence permitted the admission of "reputation evidence" to prove a relevant character trait. Rule 405, which has since been amended, provided at the time of the February 2001 trial:

> (a)    Reputation Evidence.    In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation. On cross-examination of the reputation witness, inquiry is allowable into specific

instances of conduct probative of the character trait in question, except that in criminal cases inquiry into allegations of other criminal misconduct of the accused not resulting in conviction is not permissible.

(b)  Specific Instances of Conduct.  Specific instances of conduct are not admissible to prove character or a trait of character, except as follows:

(1)  In civil cases where character or a trait of character is admissible as an element of a claim or defense, character may be proved by specific instances of conduct.

(2)  In criminal cases where character or a trait of character is admissible under Pa.R.E. 404(a)(2), the accused may prove the complainant's character or trait of character by specific instances of conduct.

*See* 30 Pa. B. 3919, Order Adopting Amendments to Rule 405 (July 20, 2000), eff. Oct. 1, 2000.

On direct appeal, Gonzalez contended that Attorney El-Shabazz was ineffective in not calling "numerous character witness[es] who would have testified to the excellent reputation for peacefulness Mr. Gonzales enjoyed in the community at the time the incident occurred."  *See* Brief for Appellant, *Commonwealth v. Gonzales*, No. 2019 EDA 2001, at 20 (filed Nov. 26, 2001) [Doc. 9, Ex. A].[13]  Petitioner identified 11 character witnesses whose names were purportedly given to counsel prior to trial and who were not called as witnesses. *Id*.  Attached to

_____

[13]  Petitioner's direct appeal, and initially his statement of this claim in his *pro se* habeas petition, also encompassed counsel's failure to call "*alibi* witnesses who were prepared to testify about Mr. Gonzales's whereabouts on 11:40 p.m., February 29, 2000, when the shooting took place." *See* Brief for Appellant, *Commonwealth v. Gonzales*, No. 2019 EDA 2001, at 20 (filed Nov. 26, 2001) (emphasis added).  The two alibi witnesses he identified were his step-father, Kevin Clark, and his "fiancée," Delphine McAliley.  An affidavit of Kevin Clark provided to the state court on direct appeal addressed both this alibi assertion and the question of Gonzalez's reputation in the community for peacefulness.  *See id.* at Ex. B (Clark affidavit that Gonzalez was "with [him]" on the night of the shooting "from between 8:45 a.m. until 10:00 p.m. and from 10:30 p.m. until midnight").  No affidavit of Ms. McAliley was ever provided.  It is apparent that Petitioner, through present counsel, has withdrawn the alibi aspect of his ineffectiveness claim for failure to call particular witnesses in the defense case at trial.

his brief were statements prepared in November 2001 from a number of individuals attesting in some manner to his good character.  *Id.* at Ex. B.

In addressing this claim in the direct appeal, the Superior Court accepted the proposition that Gonzalez supplied trial counsel with the names of witnesses and that they were "ready, willing, and able" to testify on his behalf.  Based upon its review of their statements, however, the court was unwilling to find them to have offered much in the way of valuable testimony.  The court explained:

> [M]any of the witnesses stated that they would testify that they felt Appellant was a peaceful person.  Insofar as they do so, those statements constitute individual opinions as to Appellant's peaceful nature and would have been inadmissible at trial.  Because their proposed testimony would have been inadmissible, trial counsel cannot be deemed ineffective for failing to call Appellant's "character" witnesses.  In fact, only the affidavit of Kevin Clark (Appellant's stepfather) states that Appellant had an excellent **reputation** for peacefulness in the community.  Although Mr. Clark would have testified that Appellant had an excellent reputation for peacefulness in the community, Appellant does not show that the absence of this testimony was so prejudicial as to deny him a fair trial.  The evidence adduced against Appellant at trial was overwhelming.  There is no indication that a character witness would have changed the outcome at trial.  Thus, counsel cannot be deemed ineffective for failing to call Mr. Clark as a character witness.

*Gonzales-I*, slip opin. at 17-18 (emphasis in original) (citations omitted).

Petitioner complains that the absence of testimony from such "a variety of family, friends, neighbors, and even a former coach to testify as to his good character" would have been "powerful exculpatory evidence" and, coupled with an instruction that character evidence alone can create reasonable doubt, created a reasonable probability of a different outcome in a case where the Commonwealth's theory had a "myriad of flaws."  (Doc. 61 at 21-22.)  He contends both that the Superior Court's decision was based upon an unreasonable determination of facts

regarding what the proposed witnesses could offer as to his good character and that the Superior Court unreasonably applied *Strickland* in its evaluation of the prejudice suffered by Petitioner.

First, with respect to the factual determination, Petitioner contends that the affidavits show that the witnesses had the knowledge necessary to testify that he enjoyed a good reputation, and that many of the statements reflect that the affiant had heard from others that Gonzalez was a role model and well-loved, such that the affiants' impressions of him reflected more than just their personal opinions. He complains that it was unreasonable for the Superior Court to find that the affiants stated only their "individual opinions." (Doc. 61 at 26.) Respondents contend that the state court determination that testimony consistent with the affidavits would have been inadmissible, which provided the basis for the finding that counsel did not perform deficiently, cannot be disturbed on habeas review. (Doc. 68 at 20.) They also seek to bolster the state court determination that the absence of this testimony did not prejudice Petitioner, as counsel chose a reasonable course that sought to undermine the strongest evidence against Gonzalez. They assert that the defense objective focusing on undermining the confession would not have been furthered by a "parade" of repetitive witnesses regarding the peacefulness of Petitioner and that such an approach could have dangerously opened the door to cross-examination by the prosecutor regarding their awareness of other bad acts of Petitioner, including one involving a handgun similar to the one described in his confession. (*Id.* at 22 & n.12.) With respect to the properly articulated reputational evidence proffer from Kevin Clark, Petitioner's step-father, Respondents again assert that counsel would have had a reasonable strategic basis for not putting on a witness whose testimony would likely be viewed by the jury as self-serving on behalf of his stepson, and which could subject Mr. Clark to cross-examination regarding the gun that Gonzalez said he

threw into the backyard of the family home and which was never recovered by police. (*Id.* at 25.)[14]

We have reviewed the affidavits of the proposed character witnesses identified in 2001 during the direct appeal process.[15] Many of them were neighbors and family members who described him as "a fine young man" who helped elders and played with children in his neighborhood, and whom they believed to be a peaceful person. We cannot accept Petitioner's argument that the Superior Court's interpretation of the proposed testimony of these witnesses was factually unreasonable, as there were many deficiencies in the statements that contributed to the state court conclusion that their testimony would have been precluded by the state evidentiary rules. Moreover, it is not for this Court to say that the Superior Court incorrectly determined that the proffered testimony of the witnesses other than Mr. Clark failed to comply with the state rules of evidence regarding character evidence. As to those various witnesses, then, the state court identified a presumptively legitimate rationale for counsel's failure to call these witnesses in the defense case: they were not in a position to offer admissible character evidence concerning Gonzalez's *reputation* for peacefulness. Counsel cannot be deemed to have performed deficiently in not seeking to put on evidence that would not be admissible. Therefore,

---

[14] The prosecution suggested in its closing argument that Mr. Clark might have retrieved the gun that Petitioner admitted throwing into his backyard. This argument was based upon the fact that Mr. Clark spoke with Attorney Serota after Gonzalez made his confession to police but before the police executed a search of his home and the surrounding area, during which they could not find a gun. *See* N.T. 2/20/01 at 1307-08.

[15] We do not consider the later-obtained affidavits because they were not presented to and considered by the state court during the review of this claim. Petitioner does not satisfy the criteria of 28 U.S.C. § 2254(e)(2) to expand the evidentiary record at this juncture.

Petitioner's challenge under § 2254(d)(2) to the failure to call the proposed witnesses apart from Mr. Clark must fail.

With regard to Mr. Clark, Gonzalez's step-father, we appreciate, as did the Superior Court, that his affidavit sets forth relevant and admissible reputation evidence.[16]  *See* Aff. of Kevin Clark, 11/21/01, appended as Ex. B to Brief for Appellant, *Commonwealth v. Gonzales*, No. 2019 EDA 2001 [Doc. 9, Ex. A].  The state court was willing to attribute the failure to call Mr. Clark to a strategic decision.[17]  We find it inconceivable that counsel would have *overlooked* Mr. Clark as a potential character witness, since it was he and his wife, Petitioner's mother, who retained El-Shabazz to represent their nineteen-year-old son on these capital charges.  Therefore, we must consider the failure to have called him a matter of strategy.  On this record, while we do not know the precise basis for the decision not to present character evidence from witnesses such as Mr. Clark,[18] we do know from the subsequent PCRA hearing that Attorney El-Shabazz's defense was focused on seeking to undermine the credibility of the officers regarding Gonzalez's confession.  We appreciate that putting on a weak character witness could have detracted from

---

[16]  As indicated above, Mr. Clark's affidavit also described proposed alibi evidence that he could have offered that Gonzalez was "with me on February 29, 2000 from between 8:45 a.m. until 10:00 p.m. and from 10:30 p.m. until midnight."  The ineffectiveness claim concerning alibi witnesses is no longer part of the habeas claim in this Court.

[17]  The state court did not hold an evidentiary hearing in response to this claim asserted by Petitioner, as it was heard during the direct appeal process and not PCRA review.  Accordingly, we do not have the benefit of a statement from Attorney El-Shabazz as to why he did not call Mr. Clark to offer this sort of character testimony.  In their submission, however, Respondents provide additional reasons that it might have been a poor strategy to put Mr. Clark on the stand.  *See* Doc. 68 at 25-26 (noting that Clark also offered to testify as an alibi witness and that counsel would have known him "to be a liar").

[18]  We also agree that the evidentiary value of his character testimony would have been viewed as suspect by the jury in light of his natural bias.

the focus on at the allegedly abusive or coercive tactics employed by the police that led to what counsel suggested was an unreliable confession. *See* N.T. 5/11/07 at 89-90, 119 (Attorney El-Shabazz's testimony at PCRA hearing that his "strongest strategy" was to develop case that Gonzalez made his statement in response to force employed against him). We thus cannot say that the state court unreasonably adjudicated this *Strickland* claim even as to the failure to call Mr. Clark or that its decision regarding deficient performance relied upon any unreasonable factual determination.

Petitioner also complains with respect to the Superior Court's application of *Strickland* as to this claim that the state court embraced an incorrect standard for the prejudice component. He notes that the Superior Court described an "outcome-determinative prejudice standard," allegedly in violation of *Strickland*, when it stated that there was no indication that the proposed character evidence "would have changed the outcome of the trial." (*Id.* at 25, citing *Gonzales-I*, slip opin. at 18.) We appreciate that this is not the language of *Strickland*, which speaks of a "reasonable probability of" a different outcome at trial. Assuming without deciding that the Superior Court employed a prejudice standard that was "contrary to" that of *Strickland*, and thus leaving this Court to consider the prejudice inquiry under the proper *Strickland* standard *de novo*, we cannot say that there is a reasonable probability of a different, more favorable outcome than the second-degree murder verdict the jury returned. Even without hearing character evidence, the jury accepted that the shooting of Green was not a premeditated, planned attack. Character evidence thus was not necessary to support the notion that the shooting was out of character for Gonzalez. Moreover, the introduction of character evidence had the potential to backfire in that it would have played into the Commonwealth's theory that this crime was so out of character for Gonzalez and he was so wracked with guilt the next day that he effectively turned himself in by

shoplifting the sneakers. Furthermore, the character evidence did nothing to advance the focus of the defense on undermining the identification of Gonzalez as the suspect and that the confession was unreliable as allegedly the product of police coercion. Therefore, even if the Court were to find the Superior Court to have unreasonably applied the *Strickland* standard as to prejudice, we find that there was no reasonable probability that the outcome of the case would have been different had the jury heard Mr. Clark's testimony concerning his stepson's reputation for peacefulness. Moreover, we are unable to conclude that the Superior Court's determination that counsel did not perform deficiently was unreasonable, which also forecloses relief on this ineffectiveness claim in its entirety. Petitioner is not entitled to relief on Ground Three of his petition.

> **C.** **Ground Four: Claim of ineffective assistance of counsel for failing to object to evidence of retail theft**

The final claim raised by Gonzalez is that he received ineffective assistance of counsel where trial counsel did not object to the testimony concerning his arrest for retail theft of the sneakers on March 1, 2000, which led to his contact with police. He contends that there is a reasonable probability that the result of the trial would have been different had the jury not heard "this irrelevant and prejudicial evidence." (Doc. 61 at 31.) He argues that the state court unreasonable applied *Strickland* when it rejected this claim.

Gonzalez presented this issue to the Superior Court on direct appeal. The court recognized that "reference to prior criminal activity by the accused, either expressly or by reasonable implication, is impermissible," as the admission of such evidence could lead to the inference that because the defendant had committed other crimes, "he was more likely to commit the crime for which he is being tried," "and thus effectually [sic] to strip him of the presumption

of innocence." *Gonzales-I*, slip opin. at 12 (internal citations omitted). The court noted, however, that counsel's performance could still be considered "constitutionally effective" if there were a reasonable basis for the course chosen. *Id.* at 13 (citing cases for proposition that court will find effective assistance "as soon as it is determined that counsel's decisions had any reasonable basis").

The Superior Court began with a review of the factual backdrop for this legal question:

> In the instant case, the trial court held an *in camera* discussion with counsel for both Appellant and the Commonwealth concerning Appellant's arrest for shoplifting at the sporting goods store. (N.T. *In Camera* Discussion, 2/13/[01], at 812). The trial court stated it would only allow the Commonwealth to elicit evidence to show Appellant was in custody on an "unrelated charge" when he was questioned concerning the murder of Green. (*Id.*) The Commonwealth argued the evidence of Appellant's arrest for shoplifting should be admitted because it bolstered Appellant's statement that he wanted to get arrested because he felt guilty about the murder. Appellant's counsel indicated that he might want the information regarding the arrest to come in because Appellant apparently went back to the store and tried to pay for the sneakers, and this would be inconsistent with a theory that Appellant tried to get caught because he felt guilty. (*Id.* at 814). Appellant's counsel stated that he wished to speak with his client concerning the matter, and the trial court allowed Appellant's counsel to decide the matter after consultation with Appellant. The following day, the Commonwealth introduced evidence concerning Appellant's arrest. Appellant's counsel did not object to the introduction of this evidence. On cross-examination, Appellant's counsel attempted to prove Appellant tried to return to the store to pay for the sneakers. (N.T. Trial, 2/14/01, at 898-901).

*Gonzales-I*, slip opin. at 13-14. The Superior Court acknowledged that, inasmuch as trial counsel chose not to object to the introduction of evidence concerning the unrelated theft that Gonzalez committed, there was "arguable merit" to the claim of deficient performance. *Id.* at 14. Considering the legal issue in its factual context, however, the Superior Court recognized that counsel "was faced with a rather difficult challenge of having to deal with [Gonzalez's]

statement to the police that he committed the theft because he felt guilty for shooting Green and he wanted to get caught," and that, "[f]aced with this challenge, counsel attempted to show Appellant tried to pay for the sneakers." *Id.* The court considered "[t]his tactic … an effort to rebut the inference that Appellant simply wanted to get caught for killing Green," and found that counsel's attempt to rebut this inference "had a reasonable basis[.]" *Id.* The court concluded from this that counsel's failure to object did not constitute deficient performance.[19]

Petitioner contends that the Superior Court's decision "involved an unreasonable determination of the facts," given that the court reached conclusions about counsel's strategy without benefit of an evidentiary hearing to develop a record. (Doc. 61 at 34.) *See also id.* at 36 ("We do not know why trial counsel failed to make this essential objection and it was unreasonable for the Superior Court to make these factual determinations without a hearing."). He asserts that an evidentiary hearing is necessary to properly determine trial counsel's "motivation." (*Id.*) He also argues that that the Superior Court's decision reflected an unreasonable application of *Strickland*, arguing that a reasonable attorney would have made this objection. He asserts that there was a reasonable probability that the result of the trial could have been different had the jury not heard that Gonzalez had committed this unrelated retail theft. (*Id.* at 31.) *See also id.* at 33 (arguing that the evidence that Gonzalez had "engaged in prior criminal activity severely undercut the defense's contention" that Gonzalez was not the robber and that

---

[19]   The court also noted that there was little risk of any real harm to the jury hearing that Gonzalez was accused of shoplifting a pair of sneakers. It noted that the trial court initially was going to advise the jury only that Gonzalez was in custody on "an unrelated charge" when he was questioned regarding the Green murder. Defense counsel, however, feared that the jury might then speculate as to what the "unrelated charge" was. He considered it to his advantage that the jury know that Gonzalez "was in jail for a comparatively minor, non-violent offense, so he could present more valuable refutation." *Gonzales-I*, slip opin. at 14-15.

the confession was false); *id.* at 33-34 (contending that where evidence is not overwhelming, "evidence of prior criminal activity such as an arrest can have a powerful and irreversible impact on the mind of her jury").

We agree with Respondents that the trial record sufficiently reflects that trial counsel "strategically molded" this evidence to fit with his defense theory, which was that the account offered by detectives made no sense. (Doc. 68 at 27.) After the court determined that the confession was admissible, and after the trial court advised counsel that the prosecutor would be allowed to state that Gonzalez "was in custody on 'an unrelated charge'" when he was questioned about the homicide, Attorney El-Shabazz found a way to use the circumstances of the theft arrest to cast doubt upon the statement that detectives took from Gonzalez. He cross-examined the police officer who arrested Gonzalez as to suggest that Gonzalez had returned to the store in an attempt to pay for the shoes, which was consistent with the evidence that Gonzalez had sufficient cash on him at that time to have paid for the sneakers outright. This line of inquiry sowed doubt about why Gonzalez would have turned himself into police in this manner, particularly where he did not make any reference upon his arrest to the Green homicide. In addition, trial counsel's approach ensured that the jurors would not hear about an "unrelated charge" and speculate that it was a violent crime when the offense was merely shoplifting a pair of sneakers.

We do not find the state court's resolution here to reflect an unreasonable application of *Strickland's* deficient performance prong. Counsel's decision-making as to this issue had an objectively reasonable basis. While there may have been other viable ways to handle this issue, the Superior Court reasonably determined that the course of action taken by trial counsel was adequate. Moreover, we cannot agree with Petitioner that there is reason to believe that this

strategic action by counsel, even if it could be said to reflect deficient performance, prejudiced Petitioner within the meaning of *Strickland*. Regardless of whether the quantum of evidence against Petitioner was "overwhelming," as the Superior Court characterized it, we discern little impact on the jury in this case from hearing that Gonzalez was in custody on an unrelated arrest or that he was in custody because he shoplifted a pair of sneakers. Moreover, the trial court mitigated any negative effect of this information in its charge to the jury that the evidence of the arrest for retail theft could be considered only "for a limited purpose and that's because it shows the circumstances in this case." (N.T. 2/20/01, at 1354.) The trial court admonished the jury that it was not to consider it "in any way other than for that purpose," and instructed that they "must not regard the evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt." (*Id.*) The court concluded that: "If you find the defendant guilty, it must be because you're convinced by the evidence that he committed the crimes charged, not because you believe he is wicked or may have committed some other crime." (*Id.*) Therefore, we have no trouble concluding that Petitioner has not shown that he is entitled to relief on this claim under 28 U.S.C. § 2254(d)(1) for an alleged unreasonable application of *Strickland* by the state court.

Petitioner also suggests that he is entitled to relief on this claim pursuant to 28 U.S.C. § 2254(d)(2). He considers the state court's determination of trial counsel's strategy to be improper where no evidentiary hearing was held. *See* Doc. 61 at 36 ("We do not know why trial counsel failed to make this essential objection and it was unreasonable for the Superior Court to make these factual determinations without a hearing."). We find the evidentiary record sufficiently developed for the state court to have reached the conclusions it did, particularly where a sidebar discussion occurred during trial that demonstrated counsel's awareness of the

issue and memorialized the options available to him.  We thus find that § 2254(d)(2)'s provision regarding unreasonable factual determinations does not provide any basis for relief on the *Strickland* claim asserted in the final ground of Gonzalez's petition.

## IV.    CONCLUSION

As set out above, we conclude that the state court did not unreasonably adjudicate the claim concerning the admission of Gonzalez's police statement nor any of his claims of ineffective assistance of counsel in light of the factual evidence before it.  The legal conclusions reached by the Superior Court did not reflect unreasonable applications of *Strickland* or its progeny where none of Petitioner's claims demonstrated both deficient performance by counsel coupled with a showing of prejudice to him, and none of the state court decisions were based upon an unreasonable determination of facts.  As Gonzalez was given an opportunity to develop the facts as to the ineffectiveness claim presented on PCRA review, and where the appellate court considered potential witness affidavits in the ineffectiveness claim presented on direct appeal, we find that Gonzalez is precluded from further development of the record pursuant to 28 U.S.C. § 2254(e)(2).

Pursuant to Local Appellate Rule 22.2 of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district judge is required to make a determination as to whether a certificate of appealability ("COA") should issue.  Under 28 U.S.C. § 2253(c), a habeas court may not issue a COA unless "the applicant has made a substantial showing of the denial of a constitutional right."  *See also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, we do not believe a COA should issue.

Our Recommendation follows.

# R E C O M M E N D A T I O N

**AND NOW**, this 25th day of April, 2018, it is respectfully **RECOMMENDED** that the petition for a writ of habeas corpus be **DENIED**.  It is **FURTHER RECOMMENDED** that a certificate of appealability should **NOT ISSUE**, as we do not believe that Petitioner has demonstrated that reasonable jurists would debate whether his petition states a valid claim.

Petitioner may file objections to this Report and Recommendation.  *See* Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any appellate rights.

BY THE COURT:


 /s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE